## BALDWIN LOCOMOTIVE WORKS v. McCOACH.

(District Court, E. D. Pennsylvania. June 27, 1914.)

### No. 2968.

TAXATION (§ 376*)—EXCISE TAX ON CORPORATIONS—COMPUTATION OF NET INCOME.

The net income of a corporation, subject to excise tax under Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (U. S. Comp. St. Supp. 1911, p. 946), is not to be determined by bookkeeping facts, but by the real facts of gross income and actual payments therefrom for the purposes specified, to which may be added only a reasonable allowance for depreciation of property, if any. An increase in the book value of the assets of a corporation by a revaluation of property does not constitute any part of the gross amount of its "income received within the year." On the other hand, a book charge because of the sale of an issue of bonds at less than par, or because of bad debts or for money paid out for charities, is not a part of the "expenses actually paid within the year out of income" to be deducted from gross income.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 625, 629–631; Dec. Dig. § 376.*]

At Law. Action by the Baldwin Locomotive Works against William McCoach, late Collector of Internal Revenue for the First District of Pennsylvania. On motion for judgment for want of sufficient affidavit of defense. Sustained in part.

John G. Johnson, of Philadelphia, Pa., for plaintiff.

Edwin S. Kremp, Asst. U. S. Atty., of Reading, Pa., and Francis Fisher Kane, U. S. Atty., of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This case and the others which were argued with it by consent involve but one general question which the court is asked to pass upon. That question is whether the plaintiff is liable to the tax which it has paid and which it is seeking to have returned to it. It is conceded by both sides that if the tax was collectible judgment should be refused. If it should not have been collected under the facts as averred in the affidavit, the plaintiff is entitled to the judgment asked for. Whether the tax in this sense was payable depends upon the act of Congress by authority of which the collection is sought to be justified.

The pertinent sections of this act are these:

"Sec. 38. That every corporation * * * organized for profit and having a capital stock represented by shares * * * now or hereafter organized under the laws * * * of any state or territory of the United States * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such corporation * * * equivalent to one per cent. upon the entire net income over and above $5,000 received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations * * * subject to the tax hereby imposed. * * * Second. Such net income shall be ascertained by deducting from the gross amount of the income of such corporation * * * received within the year from all sources (first) all the ordinary and necessary expenses actually paid within the year out of income in the maintenance and operation of its business and properties, including all charges such as rentals or franchise payments, required to be made as a condition to the continued use or possession of property. (Second) All losses actually sustained within the year and not compensated by insurance or otherwise, including a reasonable allowance for depreciation of property, if any. (Third) Interest actually paid within the year on its bonded or other indebtedness, * * * not exceeding the paid up capital stock of such corporation * * * (Fourth) All sums paid by it within the year for taxes * * * (Fifth) All amounts received by it within the year as dividends upon stock of other corporations * * * subject to the tax hereby imposed."

The importance of having a proper construction placed upon the act cannot be overrated. It is important alike to the taxpayer and to the government. The answer to the question ought to be made to rest upon some intelligible and ascertainable principle of law, and not be made to depend upon either the liberality of the taxpayer or the amiability of the officials of the Internal Revenue Bureau in reaching an agreement upon the return upon which the amount of the tax is based.

The usual claims to favorable consideration have been put forth, on the one hand, because the corporations concerned have included in the amount of their "net income" moneys which might have been excluded, and, on the other, that the government has consented to deductions from "gross income" which might have been disallowed. Neither is subject to just criticism for standing out for its rights. The most popular heroes in the history of our race are the Hampdens, and there is the best of authority for holding that Cæsar is entitled to have rendered to Cæsar the things which are his.

The question before the court is a very narrow one. There are no constitutional principles involved. Whatever might be urged as to whether this is a direct tax has been disposed of by the finding that it is an excise, and, it being excise, it is admittedly within the power of

Congress to declare what shall be paid. To this declared will of Congress all must bow. The only inquiry left to us therefore is what is the declared will of Congress? The first observation called forth by the act of Congress is that Congress has declared its will upon three points: First, that the amount of the tax shall be based upon the "net income" received by the taxpayer within the year. Secondly, that this "net income" shall be determined by finding first the "gross income" and then taking from this amount certain specified deductions. Thirdly, no deductions, with one exception, shall be made unless the amounts to be deducted were paid out of income within the year, and no income is to be considered unless it was income received within the year. The general purpose is first to have the amount of the "net income" received during the year determine the amount of the tax.

The second observation to be made is the choice of terms which Congress has made. The amount of the tax might have been made to turn upon the "net gains, profits, increase and income" or upon the amount or value of the "net assets" of the taxpayer or upon the "increase in the net assets." Congress has seen fit to confine itself to the "net income" alone. This is also of some importance, because a reference to the tax laws of the several states and the act passed following the sixteenth amendment will disclose a more embracing phraseology than mere "net income." A like choice of words is to be discovered in the part of the act which enumerates what may be deducted from the "gross income." The "ordinary and necessary" expenses, the "losses," the "taxes," etc., are all to be determined by what the corporation has actually "paid." It is not "expenses and losses" which have been properly "incurred" or taxes which have been lawfully "assessed," but the amount which has been "paid" is made the criterion. The deduction of a reasonable allowance for "depreciation," which is permitted also to be made from the amount of the gross income, is not out of harmony with this general test of "payment." It is the case of "the exception proving the rule," because this allowance, not being for actual payment, would not be justified were it not expressly mentioned. It is allowed because, while not in form a payment, it is one in a real sense. What Congress meant to have allowed is what conservative business men charge off annually from "machinery" and like accounts. The textile manufacturer, for instance, who annually charges off 10 per cent. from his "machinery" account, is merely arbitrarily assuming and anticipating that in ten years' time he will be required to actually pay out the 100 per cent. for new machinery, and he is only distributing that actual payment over the ten-year period both to keep himself from fooling himself into believing that he is making more money than he is really making, and to give greater uniformity to his statements of annual profits.

What inferences may properly be drawn from this choice of phrases by Congress will be considered later.

The use of any words brings us to the point to which all discussions in the last analysis come, to wit, a matter of mere definition. When Congress used the words "net income," "expenses, losses, taxes, etc., paid," what did Congress mean? Whatever definitions may be form-

ulated of the word "income," one thought is always conveyed, and that is, what comes in as contrasted with what goes out—"income" as contradistinguished from "outgo." The man who starts with a certain cash capital and who pays cash for everything he buys and gets cash for everything he sells, and puts all his receipts into a bag from which he makes all his payments, can readily determine his "net income" by the simple process of counting the money in the bag and deducting therefrom the amount of capital with which he started. When he takes an account of stock and adds this, he knows the amount of his nominal profits. If he keeps two bags, one for capital, and the other for profits, and borrows from one to put in the other, and keeps an account of these borrowings, and if he buys and sells on credit and keeps an account of these transactions, he has entered upon the domain of the bookkeeper. The difficulty which he then encounters is due to this, that bookkeeping is an artificial and arbitrary system of keeping accounts, and he can increase or deplete his nominal profits at his will. More actually insolvent business ventures have been made to appear nominally profitable by bad bookkeeping than in any other way. A manufacturing concern, for instance, which is a fit subject for proceedings in bankruptcy, may be made to show large nominal profits by the fraudulent expedient or the honest mistake of charging repairs which properly belong in the expense account up to a machinery or other capital account and thus be made to figure as assets. By the reverse process of bookkeeping all profits may be made to disappear. Proper bookkeeping, therefore, involves in this respect the highest business judgment, and "profit" and "loss," "capital" and "income" become mere bookkeeping terms.

To come from general illustrations to the specific instances furnished by the facts in this case, the Baldwin Locomotive Works revalued some of their properties with the result of an increase of $3,750,000 in the nominal value of their assets. On a statement of their book assets and liabilities their nominal profits for the year in which this was done were that much more than they would otherwise have appeared to be. Was their "income" for that year that much more? They made an issue of bonds to the amount of $10,000,000 and sold the bonds at 95. As a matter of bookkeeping they credited one account as if they had received $10,000,000 and charged another as if they had paid out $500,-000. Was their net "income" for that year $500,000 less than it would otherwise have been? In the one case, it is clear that there had been a nominal, not an actual, receipt of $3,750,000, and, in the other, not an actual payment of $500,000 out of gross income. In each case, the bookkeeping was based upon an anticipated not a past event. As in the latter case, assuming the solvency of the corporation, the payment is practically certain to be required, it is equally good bookkeeping to charge up the whole amount at once as for the expense of a broker's commission, or to apportion the sum over a part or the whole of the life of the bonds, or to charge up the whole amount when the bonds come to be paid. In the former case, to enter the increased value as realized is good or bad bookkeeping according to whether the anticipation of realization is justified or not.

These instances afford us a touchstone for this case.

Whether it was good business policy to charge off this $500,000 in a lump at the time the bonds were sold or apportion it over two years' time, as the managers of this company thought, or to apportion it among the 31 years the bonds have to run, as the defendant thinks, or whether the $500,000 should be charged up when the principal of the bonds is paid, is wholly and purely a question of bookkeeping. The same observation applies to the bookkeeping act of having the books show that a particular piece of property possesses a certain value. The bookkeeping system or business policy may be adopted of charging up all the property acquisitions of the corporation at the cost price irrespective of any estimated value it may have. The policy may be adopted of having the book account follow all the variations and vagaries of the market.

The first question to be determined, therefore, is whether the amount of net income is to be determined according to mere bookkeeping facts or according to the real facts of gross income and the actual payments thereout for the purposes specified in the act. This must be determined from the language employed by Congress. If the amount is to be determined by the mere bookkeeping facts, then it is difficult to escape the conclusion that we must take the facts from the books as kept, assuming, of course, their integrity and that they were kept in good faith. No other bookkeeper, governmental official, or otherwise, could be permitted to manufacture a different set of bookkeeping facts for the plaintiff. If the amount is to be determined by the real facts, then a judicial inquiry must be made which will disclose them. This is not as easy to determine as it might seem to be, because we may become so familiar with a bookkeeping fact as to be unable to distinguish the real fact. Waiving for the moment whether any man actually increases his "gross income" by the simple expedient of saying what he has is worth so much and writing his say-so upon his books, it would doubtless surprise many bankers and merchants to be told that banks did not receive and merchants did not pay interest in advance when a note is discounted. Yet it is undoubtedly true that if the note is not paid at maturity no interest is ever paid. The real difficulty is one of apperception in that we may have different concepts of the same thing. This bond issue may, for instance, be treated as the borrowing of $10,000,000 for the use of which the plaintiff paid $500,-000 down and interest thereafter until the loan was repaid. It may be treated as the borrowing of $9,500,000 for the use of which the plaintiff agreed to pay interest on $10,000,000 annually and $500,000 additional when the loan matured. It may be treated as a sale of property as that the plaintiff had bonds which it valued at $10,000,000 and sold for $9,500,000. It may be treated as a service transaction in which plaintiff employed some underwriter to sell its bonds and paid $500,000 for the service. All of these concepts would arise out of the same fact that the plaintiff had received $9,500,000 and had agreed to pay $10,000,000 with interest. Any discussion as to which was the true concept would be purely academic and turn upon economics or take us within the domain of metaphysics. Some help might be had

from the analogue of income and capital between life tenants and remaindermen, but we are driven in the end back to the act of Congress. The question must therefore be determined by discovering what Congress intended to be paid as disclosed by the language of the act and applying this meaning by some practical method to the facts of the particular case.

Recurring to the phraseology of the act to determine whether this nominal increment of value is "gross income" and whether this discount on the price of bonds sold is to be deducted in determining the "net income," we find the questions narrowed to these:

(1) Is this increase in the estimate of value of assets any part of the "gross amount of the income received within the year"?

(2) Is this sum of $500,000 any part of the "ordinary and necessary expenses actually paid within the year out of income in the maintenance and operation of its business and property including" rentals, etc., or is it "interest actually paid within the year on its bonded indebtedness"?

The question would ordinarily be further narrowed by the record fact that the question arises on a rule for judgment for want of a sufficient affidavit of defense and be made to turn upon the averments of the affidavits which must, of course, be taken as verity. The statement of claim and the affidavit of defense agree, however, as to the facts. They differ only in the legal conclusions drawn therefrom.

Before drawing these conclusions, we will refer again to the exception in the act, of depreciation in value of property allowed as a deduction from gross income. If this had not been expressed, would any depreciation have been allowed? As the act does not provide that any increment in value shall be added to the gross income, whence comes the authority to add it? As no deductions can be made except those named, all of which must consist of amounts paid and also of amounts paid within the year and still further of amounts paid within the year out of the gross income, how can we find this $500,000 to have been paid out of income without holding the $10,000,000 out of which it was paid (if as yet it has actually been paid at all) to be income and adding that to the taxable sum?

The conclusions reached and the reasons therefor are as follows:

1. The $10,148.01 deduction for the year 1910 on account of what was received for interest, not dividends, is admittedly not properly to be deducted.

2. The $4,838.49 similar deduction for the year 1911 and the $20,306.49 bad debts deduction aggregating $25,144.98 are also admittedly not to be deducted.

3. The $83,870.94 deduction on the $500,000 out of the bond issue for the year 1910 is held not to be a proper deduction and is liable to tax.

4. The $12,245.80 paid for charities in 1910 is held not to be a proper deduction because we are bound by the fact as stated that this was a charitable gift, not an expense, and charitable gifts are not mentioned among the permitted deductions. The amount is therefore taxable.

5. The increased valuation in 1910 of $593,449.66 net of certain properties was not gross income received during that year and is not taxable.

6. This applies also to the $435,000 increase in the estimated value of the stock of the Standard Steel Works Company.

7. This applies also to the $2,954,086.72 estimated value of patterns, etc., not theretofore valued.

8. The conclusion 3 as to 1910 deduction claimed on the $500,000 bond issue account applies also to the $391,935.48 deduction claimed for 1911. This sum is taxable.

9. The conclusion 4 as to 1910 deduction for charities applies to the $1,723.85 charities account for 1911.

The plaintiff has leave to move for judgment for part of the $42,-852.37 claimed in this action in accordance with the conclusions above stated, to wit, $40,325.36, with interest thereon from October 23, 1913, and costs of suit; otherwise rule for judgment discharged.