RALPH SLOSSER v. GREAT NORTHERN RAILWAY COMPANY.[1]

October 13, 1944.

No. 33,827.

[1]Reported in 16 N. W. (2d) 47.

*Christian G. Dosland,* for appellant.

*A. L. Janes, J. H. Mulally,* and *Henry C. Stiening,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff's farm was largely inundated by excessive surface waters during the crop-growing season of 1943. Convinced that defendant was at least partly to blame, he brought this tort action to recover damages. When the parties rested, defendant's motion for an instructed verdict was granted. Plaintiff's motion for a new trial was denied, and he appeals.

Plaintiff's farm lies in an area of flat land where the natural drainage is toward the northwest. Some 36 years ago the county board of Clay county established and constructed county ditches Nos. 6 and 7 to provide drainage for the locality. These ditches were so laid and constructed that the excavated material from them was used as a base for a highway.

Garrett v. Skorstad, 143 Minn. 256, 257, 173 N. W. 406, decided in 1919, contains a full recital of the facts in regard to these ditches, the following summation of which is deemed helpful:

"* * * In 1907 and 1908 the county board constructed ditch No. 6 along the north line of his [Garrett's] land and wasted the earth to the north on the highway along the section line. This ditch is 9 miles long. Ditch No. 7, established at the same time, is 11 miles long, and connects with No. 6. Physically they are one ditch 20 miles long extending directly east from the Red river on a section line. * * * Ditch No. 7 intersects the [Felton] state ditch a mile east of ditch No. 6, * * *.

"The waters from the foothills at the east come into No. 6 through No. 7 and No. 7 receives some of the foothills' waters through the state ditch. The foothills are springfed and flow in winter time. The result is that when spring comes it is not unusual that No. 6 down towards the Red is solid ice from its bed to the top of its banks. It then is of no value for surface drainage until thawed out; and when the waters come from the foothills in the spring there is flooding. And even later, in summer, when the waters come in great quantities from the foothills, and they often do, No. 6, which is not of large capacity, is unable to care for them, and flooding results, from which the plaintiff and others south of No. 6 suffer."

Then, in 1922, following that decision, additional ditch proceedings were had, resulting in the establishment and construction of what is now county ditch No. 45. That which was formerly ditches Nos. 6 and 7 became lateral No. 1 of the new ditch. All owners of land assessed for benefits in the prior proceedings, including plaintiff's predecessor in title and interest, and defendant railway also, were made parties to the new proceeding. As to both, additional benefits were found and assessed, and later paid. In the new construction, as in the former proceedings, the excavated material taken from the new ditch was deposited on the section line and there made use of as a public road. The engineer in the new proceedings made provision for the construction of culverts through the road grade. His specifications provided:

"*Where specified* the ends of the culverts shall be fitted with valves or gates, accurately fitted and so designed that they will open to permit the flow of water into the ditch [from the north side of the ditch grade], but when the water in the ditch covers the lower end of the culvert, the gate will close and prevent the water from spreading over the adjoining land [to the north]." (Italics supplied.)

In the new construction many such culverts were installed. But

prior to its construction no such provisions had been made, and of course no valves or gates had been installed.

Defendant's line of railroad at this point runs due north and south and was constructed in 1872, many years before any ditch proceedings were thought of. It constructed and has since maintained many culverts and bridges where it deemed them necessary to protect its roadbed from surface water. The culverts here involved have been replaced and maintained ever since at the exact spot where originally built. Never has defendant been notified or required to install any valves or gates in these culverts.

Plaintiff's theory seems to be that, since other culverts were provided for and designated by the engineer to have such gates and since defendant was a party to the ditch proceedings, it became its duty to install in its culverts similar valves or gates; that, since it failed so to do, his land having been inundated largely because of the absence of such gates, therefore liability follows.

In disposing of this claim adversely to plaintiff's contentions, the court reviewed the facts and gave its reasons for the conclusion reached. (We quote only the portions which directly bear upon the problem presented.)

"* * * In this case it appears uncontroverted in the testimony that in 1906 the railroad company was maintaining and had at the place in question culverts which were larger than the culverts that are in place now, and there is no evidence to indicate that the location of the present culverts is any different than it was at that time. In 1906 and '07 the ditch in question was constructed so that the culverts have been there as long as the ditch has, if not longer. In the documentary evidence and the specifications governing the construction of that [No. 45] ditch there is reference to the requirement that gates be placed upon culverts as specified by the engineer, but so far as the documentary evidence goes there was never any specification requiring that gates be put on the railroad culverts, and it stands uncontradicted in the testimony that those culverts have never borne gates. Furthermore there is not one word of evidence in this case to show that by any act in writing the engineer

required gates to be installed upon those culverts." And, concluded the court, since defendant was not required to install or maintain culverts with gates, therefore "it has done no wrong and cannot be held liable in damages. * * * I can find nothing to show that defendant violated any requirement" as to maintaining gates at the place in question. Plaintiff having acquired his farm "long after the ditch was constructed * * * he acquired a right to the ditch as it existed at the time he bought the land, a right which has been paid for by his predecessor, but there were no gates on the railroad culverts when he bought the land." For these reasons a verdict for the defendant was directed.

Obviously, therefore, the only question for us is whether defendant's failure to install gates in its culverts, in the circumstances here related, was a violation of legal duty to plaintiff, thereby providing a basis for his present cause.

In Garrett v. Skorstad, *supra,* the plaintiff, whose farm was *south* of county ditch No. 6, sought injunctive relief to restrain defendants, the members of the town board and the county board of Clay county, from "obstructing a swale or coulee," which crossed his land, by maintaining an embankment along the county ditch which intersected the coulee. The trial court granted him the relief sought. On appeal, we reversed, because (143 Minn. 259, 173 N. W. 407):

"* * * It was doubtless intended that the spoil bank should be on the north side of the ditch just where it was placed. Naturally it would not be put on the south, and used for a turnpike, in a level country like this where the general drainage was to the northwest. The ditch was constructed, as it was, and without culverts, just as the county board contemplated. Whether or not it was proper to construct the ditch without culverts the ditch proceeding is now closed and res adjudicata and it cannot be attacked collaterally as it is sought to do in this case."

In Lupkes v. Town of Clifton, 157 Minn. 493, 196 N. W. 666, plaintiff's land was located *north* of a ditch. There was a shallow

ravine through his farm which the ditch crossed. There, too, the dirt from it was used to fill the ravine (157 Minn. 495, 196 N. W. 667) "pursuant to the report and directions of the engineer." His land was heavily assessed for benefits—

"not because the ditch would remove any water from plaintiff's land, but on the contrary because the ditch along his southern boundary, where there had been no drain before, with the embankment on the north side of it, would prevent the flow onto his land of the water formerly brought from the southeast by the shallow ravine already referred to."

Later, in times of flood, the embankment across the ravine was partly washed away. In that situation, defendants (157 Minn. 496, 196 N. W. 667) "concluded to reopen the ravine across the roadway to its former depth and to bridge the resulting gap." Plaintiff sought and obtained from the trial court injunctive relief to prevent the change, and defendants were required to restore the embankment to the condition in which it was when they began their excavation for the proposed opening. On appeal we reiterated and reaffirmed the conclusion reached in the Garrett case, saying (157 Minn. 497, 196 N. W. 668):

"The legislature has given to the order establishing a public ditch all of the final and binding force of a judgment in rem. Therefore, finally and for all purposes, as against the world, the res, the subject matter of the proceeding, and all property rights affected thereby, are settled, fixed in a new status to be again altered only by some authority competent to effect a change and proceeding according to law."

■ Under our drainage law provision is made for the appointment of an engineer, whose duties are many and varied. In Town of Lisbon v. Counties of Yellow Medicine, etc. 142 Minn. 299, 302, 172 N. W. 125, 126, these duties and his authority thereunder are fully recited and the pertinent sections of the statute cited. The important point here involved and there decided is that the engineer's plans and specifications, where confirmed by a valid order

"establishing the ditch, become final and conclusive, unless modified or changed as provided by the statute."

So in the instant case, the plans and specifications of the engineer, in respect to the installation of culverts with gates, "where specified" by him, became a part of the final order establishing the ditch. As pointed out in 2 Dunnell, Dig. & Supp. § 2827a, the report of the engineer when affirmed by the order establishing the ditch becomes conclusive, since it is the foundation for the assessment of damages and benefits to the interested property owners. Under the notes in that section will be found references to various provisions of our drainage act pertaining to this phase.

We think the trial court was right, and its order is accordingly affirmed.

