# MAE D. MARTIN v. WILFRED WOLFSON AND ÁNOTHER.[1]

December 15, 1944.

No. 33,769.

[1]Reported in 16 N. W. (2d) 884.

*Arthur T. Nelson,* for appellant.

*Stanley V. Shanedling,* for respondents.

*William D. Gunn,* filed a brief *amicus curiae* on behalf of Minnesota State Federation of Labor.

STREISSGUTH, JUSTICE.

Plaintiff, employed by defendants as manager and housekeeper of an apartment hotel, recovered a verdict for overtime wages due her under minimum wage order No. 13 adopted by the industrial commission in 1938 under authority of L. 1913, c. 547, as amended by L. 1921, c. 84, and L. 1923, c. 153, Minn. St. 1941, § 177.01, *et seq.* (Mason St. 1927, § 4210, *et seq.*).[2] By her appeal from an order granting defendants judgment notwithstanding the verdict, plaintiff seeks to restore the verdict against defendants' claim that the wage order is void because irregularly adopted.

The pertinent provisions of the minimum wage act are:

"177.03 The commission may at its discretion investigate the

------

[2]Subsequent references will be to sections of Minn. St. 1941..

wages paid to women and minors in any occupation in this state. * * *

"177.05 The commission shall specify times to hold public hearings at which employers, employees, or other interested persons may appear and give testimony as to wages, profits, and other pertinent conditions of the occupation or industry. The commission, or any member thereof, shall have power to subpoena witnesses, to administer oaths, and to compel the production of books, papers, and other evidence. * * *

"177.06 If after investigation of any occupation the commission is of opinion that the wages paid to one-sixth or more of the women' or minors employed therein are less than living wages, it shall forthwith proceed to establish legal minimum rates of wages for that occupation, as hereinafter described and provided.

"177.08 The commission may at its discretion establish in any occupation an advisory board, * * *. The commission shall make rules and regulations governing * * * the modes of procedure of the advisory boards and exercise exclusive jurisdiction over all questions arising with reference to the validity of the procedure and determination of these boards. * * *

"177.09 Each advisory board shall have the same power as the commission to subpoena witnesses, administer oaths, and compel the production of books, papers, and other evidence. * * *. Each advisory board shall recommend to the commission an estimate of the minimum wages, whether by time rate or by price rate, sufficient for living wages for women and minors of ordinary ability, * * *.

"177.10 Upon receipt of estimates of wages from an advisory board, the commission shall review the same and, if it approves them, shall make them the minimum wages in that occupation, as provided in section 177.07. Such wages shall be regarded as determined by the commission itself and the order of the commission putting them into effect shall have the same force and authority as though the wages were determined without the assistance of an advisory board."

It will be noted that the statute contemplates an investigation of "pertinent conditions of the occupation or industry" by the commission itself, in connection with which public hearings are to be held (§ 177.05). Not until the commission itself, "after investigation of any occupation," forms an "opinion that the wages paid to one-sixth or more of the women or minors employed therein are less than living wages," is there occasion for the establishment of "legal minimum rates of wages for that occupation" (§ 177.06), either by the advisory board or by the commission. And the question as to whether such condition exists in "any occupation" under investigation is reserved exclusively to the commission, after a hearing, regardless of what procedure it adopts to arrive at an estimate of living wages. The appointment of an advisory board is discretionary (§ 177.08). Its exclusive function is to "recommend to the commission an estimate of the minimum wages * * * sufficient for living wages" (§ 177.09). No public hearings before the board are prescribed.

In promulgating order No. 13, the commission adopted the advisory-board mode of procedure. In May 1937, it appointed a board made up of five persons representing employers, one of them a hotel owner and operator, and five persons representing employes. Later, Dr. Elizabeth Monahan, acceptable to both groups, was appointed to represent the public, and she was elected chairman. The board was not directed to function in any particular occupation, as contemplated by statute, and did not attempt so to limit its investigation. Instead, it made a general, but thorough, investigation of living costs of women in all occupations throughout the state. Its work is well summed up in its "findings and recommendations," submitted to the commission in February 1938, in the form of a letter, reciting *inter alia:*

"* * * Our conclusions were arrived at after months of investigation and the collection from various sections of the state of data that enter into costs of living in this state. Several hundred budgets of women to be affected by the proposed minimum wage were considered; department stores were visited to obtain prices of wearing

apparel; Y. W. C. A.'s, homes for working girls, hotels and restaurants were canvassed to determine an average minimum cost of board and lodgings, and every source of information available in this and other states was utilized in arriving at our schedule of minimum wages and the standard basic week for which such wages shall be paid."

Then followed a classification of cities into four classes; the recommended wage scales for women, minors, learners or apprentices in each class; definitions of terms used; and other matters not material here. There was no finding as to what percentage of women employed in any occupation was receiving less than living wages; in fact, the investigations had not covered that particular question.

The board's recommendations were published in daily newspapers of Minneapolis, St. Paul, and Duluth on February 21, 1938. On March 28, the commission published a notice of a public hearing to be held in St. Paul on April 11, for the consideration of the recommendations made by the board, inviting "any employer, employe or interested person in the state of Minnesota" to "appear at said hearing and give testimony as to wages, profits, conditions and other matters pertinent to the subject."

The public hearing was held at the time and place fixed. About 200 people attended, representing employers, employes, and the public. While witnesses were not sworn, many employers expressed their views and gave unsworn testimony as to wages, profits, and other pertinent matters. Many produced and filed data and statements showing their profits and losses and the probable effect of the proposed order on their business. Many filed briefs in support of their respective positions. In all, 36 persons were heard, most of them employers or employers' representatives, among them the president of the Minnesota Employers Association.

The hotel industry was especially well represented. The secretary of the State Hotel Association spoke briefly, introducing William Lycan of Bemidji, representing the hotel industry and its chief spokesman. Hotel owners from St. Peter, St. Cloud, Brainerd, Rochester, Glenwood, Hutchinson, and Owatonna were also intro-

duced and offered their tithes to the discussion. None of the hotel owners group who wanted to testify were "prevented from testifying or stating their views," according to the undisputed testimony of the chairman of the commission. "There wasn't a man at the public hearing that wanted to talk that did not have an opportunity."

The chairman urged all speakers "to be as brief as possible" because of the desirability of giving all groups represented "an opportunity to be heard." "The idea," he said, "would be, if we possibly could, to conclude this meeting by twelve o'clock, but if it is necessary the commission will stay here all day to hear arguments." At another time, when it was proposed to have each of 25 hotel operators present make a statement, the chairman said:

"Of course, you understand, a representative of your organization was on the advisory board. We have briefs submitted from your organization, the hotel, and the restaurant, and we have now your argument. But, of course, if you insist, I presume we will hear from them. If they desire to submit to us a written statement of their conditions, we will agree they will be read and taken into consideration. But if you still persist on having each individual speak, of course we will do it."

Notwithstanding these mild admonitions, the discussion continued well into the afternoon. Not until the commission had heard from everyone who desired to speak was the meeting adjourned, the chairman's final statements being:

"Have all of the representatives of employee groups spoken who desire? If that is correct, it is my understanding that all of the employer groups who desire have been heard. If that is correct, this meeting will stand adjourned."

We have gone to considerable length in giving the procedural background of order No. 13 because, as stated by the judges of the United States district court in a suit brought in 1938 to enjoin its enforcement, "the question whether the procedure followed by the Commission accorded with the requirements of due process is a

grave and difficult question." Western Union Tel. Co. v. Industrial Comm. (D. C.) 24 F. Supp. 370, 377. In the present case, the trial court resolved the question against the validity of the order for three reasons, which for purposes of discussion will be stated in the following sequence:

(1) "Neither the commission nor the advisory board held any hearings at which interested parties might appear and give testimony as to wages, profits or other pertinent conditions of any occupation."

(2) The commission "failed to make any finding, after investigation, that the wages paid to one-sixth or more of the women and minors employed in any occupation are less than living wages."

(3) Neither the board nor the commission made "an investigation of any particular occupation, including the hotel occupation or industry, but instead make a blanket investigation of all occupations."

■ Plaintiff seeks to prevent any and all judicial inquiry into the validity of order No. 13 by invoking the rule against collateral impeachment of judgments. Forcible reasons of public policy suggest that this is a situation calling for the application of the rule, though its operation is not as broad and extensive as plaintiff contends.

The industrial commission, which more than five years before had promulgated the order under attack, was not a party to the suit and did not have the benefit of its own counsel. The fate of the order rested entirely upon the shoulders of counsel of litigants, who may not have had either the means or the desire fully to present the case for or against its validity. We say this wholly without disparagement of counsel in this case. Yet the fact that the order was unsuccessfully attacked in other private litigation reaching this court (Tepel v. Sima, 213 Minn. 526, 7 N. W. [2d] 532; Stevenson v. St. Clair, 161 Minn. 444, 201 N. W. 629; and see, State v. Allyn, 150 Minn. 123, 184 N. W. 787), and successfully attacked up to the present stage in this litigation, emphasizes that a rule

which subjects an administrative order to the vicissitudes of indiscriminate attack in controversies between individuals as they arise can bring forth a variety of results, none of them final as between the next set of litigants. Only by adopting a rule limiting to jurisdictional and constitutional questions the right to attack such order in a collateral action can there be such uniformity in interpretation and application of administrative orders as public policy demands.

That judgments of courts of record, for like reasons of public policy, cannot be collaterally attacked except for jurisdictional defects appearing on the face of the record is of course ancient doctrine. Logically, that rule has been extended to orders and decisions of administrative boards and tribunals acting in a judicial or quasi-judicial capacity, in respect to which a direct or indirect means of judicial review—by appeal, *certiorari, mandamus,* prohibition, injunction, or otherwise—is available. See, 34 C. J., Judgments, § 826; Decennial Dig. Key No. 477; Freeman, Judgments (5 ed.) § 397; Slosser v. G. N. Ry. Co. 218 Minn. 327, 16 N. W. (2d) 47; City of Phoenix v. Sanner, 54 Ariz. 363, 95 P. (2d) 987; May v. Penton, 45 Wyo. 82, 16 P. (2d) 35. Administrative tribunals, such as the industrial commission, are part of the executive branch of the government. They illustrate, however, the tendency to overrun the strict bounds set in early legal history for the three branches of government. When they hear and determine private controversies under the laws which they administer—frequently using judicial tools and machinery—they act in a judicial capacity, and a direct form of review by appeal or *certiorari* is usually provided by law. In such instances, administrative decisions clearly fall within the rule against collateral attack.

When an administrative tribunal, pursuant to a mandate of the legislature, makes a rule or order to govern future conduct of citizens, such rule or order itself is "legislative," though a statutory hearing culminating in its adoption "has a quality resembling that of a judicial proceeding" and is therefore "frequently described as a proceeding of a *quasi-judicial* character." Morgan v. United

States, 298 U. S. 468, 479, 480, 56 S. Ct. 906, 911, 80 L. ed. 1288, 1294, 1295. And see, 42 Am. Jur., Public Adm. Law, §§ 36-49. In such instance, an opportunity for direct court review by appeal or *certiorari* is not always afforded. There are usually no direct remedies to exhaust. The cupboard is bare, and a party in search of his bone of relief from an illegal administrative order must turn to the courts, either by seeking indirect relief in a suit in equity or a declaratory judgment action, or by asserting the invalidity of the order by way of defense in a collateral civil or criminal action.

The question, therefore, naturally presents itself whether the legislative character of an administrative rule or order and the lack of opportunity of direct review by appeal or *certiorari* prevent the further extension of the rule against collateral attack to such administrative act. In other words, should the courts, because of the legislative character of an administrative order, permit unlimited impeachment thereof in proceedings to which the administrative author is not a party? We think not. Indirect attacks by suits in equity and actions for declaratory judgments in which the administrative board may be joined are still open to aggrieved parties. And the fact that an order emanates from a separate and distinct branch of government should make the judicial branch even more reluctant to review it collaterally than in the case of an order wholly judicial in character. See, Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. ed. 1078.

It does not follow, however, that, because administrative orders—legislative, as well as judicial, in character—are within the collateral attack rule, they possess a finality not attributable even to judgments of courts of record or acts of the legislature. Courts must turn a deaf ear to cries of "administrative finality" when jurisdictional and constitutional questions are involved. To say generally that an administrative order cannot be collaterally attacked is not equivalent to saying that matters going to the jurisdiction of the administrative board and to its observance of constitutional requirements cannot be raised except upon direct review in the original proceedings or upon indirect review in suits

to which the board is a party. The constitution is a standing guarantee to all litigants that the order or judgment of any board, commission, or court must fall, wherever attacked, upon a showing that fundamental requirements have not been observed.

Whatever be the character of a particular administrative act, whether executive, quasi-judicial, or quasi-legislative, its legality may be inquired into by a court, even in a collateral proceeding. The rule against collateral attack is aimed at mere irregularities and errors in judgment rendering judicial or administrative deci-sions voidable (31 Am. Jur., Judgments, § 583, *et seq.;* 42 Am. Jur., Public Adm. Law, § 159; Atlantic Coast Line R. Co. v. Florida, 295 U. S. 301, 55 S. Ct. 713, 79 L. ed. 1451, *infra;* State Tax Comm. v. Katsis, 90 Utah 406, 62 P. [2d] 120, 107 A. L. R. 1477, not at ques-tions relating to constitutional power and statutory authority of the judicial or administrative tribunal, or questions affecting con-stitutional rights, privileges, and protection of the parties affected by its action. Want of power and abuse of power are legitimate weapons of collateral as well as direct attack; and illegality of an administrator's decision may always be inquired into, whether raised in a collateral or direct proceeding. 42 Am. Jur., Public Adm. Law, §§ 157, 159; Ex parte Beck (D. C.) 245 F. 967.

■ Turning, then, to constitutional questions, the first problem is whether the hearing before the commission conformed to the re-quirements of due process of law. The advisory board held no public hearings of any kind, nor did the statute contemplate that it should. As we have already pointed out, its functions were limited to investigations and recommendations. Its purpose was to enlighten the commission and protect the public, and private interests as well, against uninformed and unwise action. Our inquiry, therefore, is as to the sufficiency of the hearing before the commission.

In the first of the landmark Morgan decisions (Morgan v. United States, 298 U. S. 468, 480, 56 S. Ct. 906, 911, 80 L. ed. 1288, 1294, 1295), Chief Justice Hughes said that a rate-making proceeding conducted pursuant to a statute requiring a "full hearing" has "a quality resembling that of a judicial proceeding," and that the

statutory requirement "has obvious reference to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts." In the second of these cases (304 U. S. 1, 18, 58 S. Ct. 773, 776, 82 L. ed. 1129, 1132), he emphasized that—

"* * * The right to a hearing embraces not only the right to present evidence but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasi-judicial proceeding aimed at the control of their activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command."

Similar expressions are found in Interstate Commerce Comm. v. L. & N. R. Co. 227 U. S. 88, 33 S. Ct. 185, 57 L. ed. 431; Shields v. Utah Idaho Cent. R. Co. 305 U. S. 177, 59 S. Ct. 160, 83 L. ed. 111; United States v. B. & O. R. Co. 293 U. S. 454, 55 S. Ct. 268, 79 L. ed. 587, and other recent decisions.

It is not claimed that the public, in general, and those present at the hearing before the commission, in particular, were not fully advised in advance of the proposed minimum wage schedule, it having been given wide publicity in advance of the hearing. Cf. Opp Cotton Mills, Inc. v. Administrator, 311 U. S. 631, 61 S. Ct. 46, 85 L. ed. 402. But it is contended that, because "no witnesses were sworn and no testimony received," the hearing was violative of due process requirements. True, no witnesses were sworn, and the chairman urged the spokesmen for the various groups who were present to be brief. But, in spite of this admonition, the commission heard them out. The hotel industry in particular was well represented, and its unsworn testimony and arguments fully heard. It is in no position to complain of the lack of formality; its spokesmen tendered no sworn testimony, nor did they demand that the proponents of the new wage scale proceed as in a court trial between adverse parties. They were content that their case be deter-

mined upon the report of the advisory board, and upon the factual data, oral statements and arguments, and written briefs in opposition.

There are some definite advantages, even in court proceedings, in being permitted to offer unsworn statements and unauthenticated data and fully to express one's views without being limited by rules of evidence or confined to the record. It is fair to assume that the spokesmen for the various industries recognized these advantages and were willing to proceed, as the commission suggested, without insisting upon the usual court trappings. And having so proceeded without protest, it does not lie in the mouths of others to protest for them.

One who would strike down a statute or an administrative order having the effect of a statute because of the manner of its adoption must show that the alleged illegal procedure operated to deprive him of rights protected by the constitution. See, Southern Ry. Co. v. King, 217 U. S. 524, 534, 30 S. Ct. 594, 596, 54 L. ed. 868, 872; 11 Am. Jur., Constitutional Law, § 111. "He may champion his own but not the rights of others." Mesaba Loan Co. v. Sher, 203 Minn. 589, 595, 282 N. W. 823, 827; Henneford v. Silas Mason Co. Inc. 300 U. S. 577, 583, 57 S. Ct. 524, 527, 81 L. ed. 814, 819. Defendants, so far as the record shows, were not present at the hearing or represented there, and should not be permitted to urge the violation of the constitutional rights of those who were present and who did not complain of the treatment accorded them.

No right to insist upon sworn testimony having been asserted by anyone at the hearing, how can it be claimed that such right was violated? Suppose no one had appeared. Could it still be claimed that the rights of some unknown future litigant had been violated? Definitely not. The right to present evidence, to have witnesses sworn, and to have them subjected to direct and cross-examination in accordance with recognized judicial procedure was the right of any interested person present at the hearing. But, unless that right was asserted, it must be considered waived. While courts have a tender regard for the rights and privileges of

citizens, there is no reason of public policy why they should invoke for him constitutional or statutory rights which he himself has voluntarily relinquished.

Except as limited by public policy, a person may waive any legal right, constitutional or statutory. Wall v. Parrot Silver & Copper Co. 244 U. S. 407, 411, 37 S. Ct. 609, 611, 61 L. ed. 1229, 1231, affirming Wall v. Anaconda Copper Min. Co. (D. C.) 216 F. 242; State ex rel. Allstate Ins. Co. v. Bowen, 130 Ohio St. 347, 199 N. E. 355; 16 C. J. S., Constitutional Law, § 89, note 4. Mere irregularities in the method of procedure are well within the rule and may be waived by consent. 6 Dunnell, Dig. § 10135; 16 C. J. S., Constitutional Law, § 89. And, if the failure to swear a witness in an ordinary civil trial, or even in a criminal trial, may be waived by failure to object or by express consent (70 C. J., Witnesses, § 654; 39 Am. Jur., New Trial, § 32), clearly the right to have witnesses sworn and subjected to examination in an administrative hearing conducted without traditional court ritual must be considered as waived where interested parties participate therein without questioning the procedure. People ex rel. Neibuhr v. McAdoo, 184 N. Y. 304, 77 N. E. 260, 6 Ann. Cas. 56; Proctor v. Smith (Tex. Civ. App.) 299 S. W. 663. To borrow from Pierce Oil Corp. v. Phoenix Refining Co. 259 U. S. 125, 128, 42 S. Ct. 440, 442, 66 L. ed. 855, 858:

"There is nothing in the nature of such a constitutional right as is here asserted to prevent its being waived or the right to claim it barred, as other rights may be, by deliberate election or by conduct inconsistent with the assertion of such a right."

In McGrew v. Industrial Comm. 96 Utah 203, 85 P. (2d) 608, the supreme court of Utah took a contrary view of proceedings conducted much in the same manner as the proceedings here under review. The attack upon the regularity of the proceedings was there made in an injunction suit instituted by those who participated in the proceeding, and not in a collateral action against nonparticipants. The court considered the question of waiver, and apparently ruled against it (see concurring opinion). While we

are impressed with much that is said in that case, we are definitely of the opinion that in the case before us there was a waiver of any irregularities in the proceedings before the industrial commission, and that the irregularity in not having witnesses sworn and examined and otherwise conducting the hearing in accordance with "the tradition of judicial proceedings" was not of such a character as could be urged by a third person in a collateral proceeding.

In G. O. Miller Tel. Co. v. Minimum Wage Comm. 145 Minn. 262, 269, 177 N. W. 341, 344, this court said in respect to the necessity of findings to sustain the validity of a minimum wage order:

"The statute does not require a formal finding or a recital of the opinion of the commission after investigation. To make the order it is necessary that the commission have an investigation and reach the opinion which the statute requires, but the statute does not require a formal recital or finding."

Notwithstanding this positive language, the trial court in the instant case held that the absence of findings was a jurisdictional defect and fatal to the validity of order No. 13. It relied upon Wichita R. & L. Co. v. Public Utilities Comm. 260 U. S. 48, 43 S. Ct. 51, 67 L. ed. 124; Mahler v. Eby, 264 U. S. 32, 44 S. Ct. 283, 68 L. ed. 549; and Panama Ref. Co. v. Ryan, 293 U. S. 388, 55 S. Ct. 241, 79 L. ed. 446. In the first two cases, as pointed out by Mr. Justice Cardozo in his dissent in the Panama case, "it was a specific requirement of the statute that the basic fact conditioning action by the administrative agency be stated in a finding and stated there expressly." (293 U. S. 448, 55 S. Ct. 260, 79 L. ed. 473.) However, notwithstanding there was no similar statutory requirement in the "hot oil" statute, the court in the Panama case said (293 U. S. 432, 55 S. Ct. 253, 79 L. ed. 465):

"* * * If the citizen is to be punished for the crime of violating a legislative order of an executive officer, or of a board or commission, due process of law requires that it shall appear that the order is within the authority of the officer, board or commission, and, if

that authority depends on determinations of fact, those determinations must be shown."

The principal concern in the "hot oil" case was the "unconstitutional delegation of legislative power," and the necessity of findings was an alternative ground for decision. That circumstance does not necessarily make the ruling on the necessity of findings *obiter dictum* (14 Am. Jur., Courts, § 83; Union P. R. Co. v. Mason City and Fort Dodge R. Co. 199 U. S. 160, 26 S. Ct. 19, 50 L. ed. 134); yet the scope of that ruling was sharply curtailed in another opinion handed down on the same day. In United States v. B. & O. R. Co. 293 U. S. 454, 464, 465, 55 S. Ct. 268, 272-3, 79 L. ed. 587, 595, after reiterating that orders of the interstate commerce commission must be accompanied by "basic or essential findings," the court, in note 9, said: "A different rule has been applied to executive action not subject to review."

Later, but at the same term, the court announced a rule, clearly decisive here, that, notwithstanding the absence of findings of fact to support a rate order, the order was not void, but voidable only, and not subject to collateral attack.

"* * * The carrier," said the court, "was not at liberty to take the law into its own hands and refuse submission to the order without the sanction of a court. It would have exposed itself to suits and penalties, both criminal and civil, if it had followed such a path. * * * Obedience was owing while the order was in force." Atlantic Coast Line R. Co. v. Florida, 295 U. S. 301, 311, 55 S. Ct. 713, 717, 79 L. ed. 1451, 1458, rehearing denied, 295 U. S. 769, 55 S. Ct. 918; 79 L. ed. 1710.

At the next term, the court decided what might aptly be called the "raspberry" case, in which the necessity of findings to support an order of a state administrative board prescribing the use of a certain type of berry container was held to depend upon whether the statute expressly required them. Pacific States B. & B. Co. v. White, 296 U. S. 176, 186, 56 S. Ct. 159, 164, 80 L. ed. 138, 146, 101 A. L. R. 853, 861. Though the "hot oil" decision had been under

discussion in respect to other aspects in the case, the court dismissed the contention that the order was void for want of "special findings of fact" with the single statement: "But the statute did not require special findings; doubtless because the regulation authorized was general legislation, not an administrative order in the nature of a judgment directed against an individual concern," citing the Wichita and Mahler cases for comparison. The statutory requirements of "investigation and public hearing" were not considered important, much less decisive, on the question of the necessity of findings, but merely as supplying "added reason for applying the presumption of validity" to the administrative order (296 U. S. 178, 186, 56 S. Ct. 160, 163, 80 L. ed. 142, 146).

Minimum wage order No. 13 was fashioned in much the same manner as the Oregon berry container order and, upon authority of that decision, we adhere to our holding in the Miller telephone case, that a minimum wage order is neither void nor voidable because unsupported by formal recitals or findings of fact. See, also, 42 Am. Jur., Public Adm. Law, § 96; 19 Minn. L. Rev. 763; 25 Va. L. Rev. 810, 815; 34 Am. Pol. Science Rev. 1, 12-13; Annotation, 146 A. L. R. 209; Hart, "An Introduction to Adm. Law," p. 250; American T. & T. Co. v. United States (D. C.) 14 F. Supp. 121, affirmed, 299 U. S. 232, 57 S. Ct. 170, 81 L. ed. 142; California Drive-in R. Assn. v. Clark, 22 Cal. (2d) 287, 140 P. (2d) 657, 147 A. L. R. 1028 (minimum wage order).

 Finally, we consider the claim that order No. 13 is void because, as recited in the lower court's memorandum, the commission failed to make "an investigation of any particular occupation, including the hotel occupation or industry, but instead made a blanket investigation of all occupations."

In G. O. Miller Tel. Co. v. Minimum Wage Comm. 145 Minn. 262, 267, 177 N. W. 341, 343, *supra,* it was declared:

"* * * the legal minimum wage which it [the statute] authorizes the commission to fix is not a blanket minimum wage throughout the state for women or for minors, without reference to wage conditions in the different occupations, but is a minimum wage based

on the different occupations and fixed after an investigation and determination of wage conditions therein."

Mr. Justice Dibell pointed out that the statute "reaches a single occupation in which one-sixth of the workers are paid less than a living wage. It does not reach an occupation, unless such condition exists, though one-sixth of the entire body of workers in all occupations receive less than a living wage." (145 Minn. 269, 177 N. W. 343.) Nevertheless, order No. 10, there under consideration, was held valid, it appearing from the answer that the commission, after a complete investigation, was "of the opinion that more than one-sixth of the women and more than one-sixth of the minors employed in the state in each and every occupation were receiving less than a living wage" and that, "as a matter of fact more than one-sixth of the women and more than one-sixth of the minors employed by the independent telephone companies and manufacturing plants, in which class plaintiff's employees and those of the interveners herein are included, were receiving less than living wages * * *." (145 Minn. 270, 177 N. W. 344.)

In Tepel v. Sima, 213 Minn. 526, 532, 533, 7 N. W. (2d) 532, 535, we held that testimony of the chairman of the commission that "a thorough and extensive investigation had been made," and that he was of the opinion that "more than one-sixth of the minors employed in the state in each and every occupation were receiving less than a living wage," before the actual order was formulated, was sufficient to sustain the order. We said:

"* * * The commission might more properly have investigated one occupation at a time, but there could be no fatal objection to its investigating all occupations together and to its making one order applying to 'each and every occupation,' provided always that it found as a fact that 'more than one-sixth of the women and more than one-sixth of the minors employed in the state *in each and every occupation* were receiving less than a living wage at the time.'"

Here, the record does not contain similar testimony of the chairman, but it establishes convincingly that all occupations in the state in which women were employed, and particularly the hotel industry, were thoroughly investigated by the advisory board, the commission, and members of its staff. What facts were shown and established at the public hearing is not disclosed by the record. Unsworn statements in the nature of testimony made at that hearing were apparently not preserved, and the written factual data filed with the commission, though preserved, was not offered in evidence in the present action. Even were it permissible, it would be a practicable impossibility, upon the record before us, to review the facts upon which order No. 13 was based, or to determine whether there was sufficient evidence to justify an "opinion" upon the jurisdictional facts.

But the burden was not upon plaintiff to prove the justifying facts, for "to all administrative regulations purporting to be made under authority legally delegated, there attaches a presumption of the existence of facts justifying the specific exercise." Thompson v. Consolidated G. U. Corp. 300 U. S. 55, 69, 57 S. Ct. 364, 371, 81 L. ed. 510, 518; Pacific States B. & B. Co. v. White, 296 U. S. 176, 186, 56 S. Ct. 159, 80 L. ed. 138, 146, 101 A. L. R. 853, supra; United States v. Chemical Foundation, Inc. 272 U. S. 1, 47 S. Ct. 1, 71 L. ed. 131; 42 Am. Jur., Public Adm. Law, §§ 219, 220, 240; 40 Col. L. Rev. 1013. And, even were the record complete, the collateral-attack rule would protect such a regulation against attack on the ground that the facts upon which it was based were not sufficiently established by proof. Atlantic Coast Line R. Co. v. Florida, 295 U. S. 301, 55 S. Ct. 713, 79 L. ed. 1451, and Yakus v. United States, 321 U. S. 414, 64 S. Ct. 660, supra; State Tax Comm. v. Katsis, 90 Utah 406, 62 P. (2d) 120, 107 A. L. R. 1477; Twin City Milk Producers Assn. v. McNutt (8 Cir.) 122 F. (2d) 564, 566; Thompson v. Board of Education, 57 N. J. L. 628, 31 A. 168.

"An order or judgment is none the less conclusive collaterally because it was pronounced by an inferior court or by a quasi-judicial tribunal. When acting within their powers and upon a matter

over which their jurisdiction has been duly invoked, they have the same right under the law to make determinations which shall be free from collateral impeachment as tribunals of superior powers." 1 Freeman, Judgments (5 ed.) § 397.

■ There is another principle already referred to which effectively disposes of defendants' contention that order No. 13 was a blanket order, namely, that no one can obtain a decision as to the invalidity of a law on the ground that it impairs the rights of others. 11 Am. Jur., Constitutional Law, § 111; Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 541, 34 S. Ct. 359, 58 L. ed. 713, 719. The rule given in State v. Casualty Mut. Ins. Co. 213 Minn. 220, 224, 6 N. W. (2d) 800, 802, that, "Where the particular objectionable feature of a statute does not operate so as to prejudice a party, he is without interest to raise the question of constitutionality," applies equally to an attack upon an administrative order upon the ground that it did not comply with the conditions of a statute authorizing its promulgation.

On this aspect of the case, the burden of proof was upon defendants, who claimed themselves harmed by the blanket order, to show how as to them, as hotel operators, the order was illegal. See, 11 Am. Jur., Constitutional Law, § 111; Stockholders of People's Bkg. Co. v. Sterling, 300 U. S. 175, 57 S. Ct. 386, 81 L. ed. 586; Premier-Pabst Sales Co. v. Grosscup, 298 U. S. 226, 56 S. Ct. 754, 80 L. ed. 1155. But, upon the record, defendants cannot claim that the hotel industry was not investigated, and investigated thoroughly. Order No. 13 was in fact based largely upon the condition in that industry. It is no concern of defendants that some other occupation or industry was not investigated.

None of the grounds of attack upon order No. 13 being valid, it follows that the judgment for defendants must be reversed with directions to enter judgment for plaintiff upon the verdict.

Appellant is awarded $200 attorneys' fees in addition to statutory costs and disbursements and without prejudice to such addi-

tional allowance as may be made by the lower court for legal services rendered in that court.

So ordered.