**STATE of Minnesota, Respondent,**

**v.**

**Jeffrey Brian NESS, Appellant.**

**No. CX–87–2510.**

Supreme Court of Minnesota.

Nov. 10, 1988.

C. Paul Jones, State Public Defender, Melissa Sheridan, Asst. State Public Defender, University of Minnesota, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Mary J. Theisen, Sp. Asst. Atty. Gen., St. Paul, and Scott A. Hersey, Isanti Co. Atty., Isanti County Courthouse, Cambridge, for respondent.

YETKA, Justice.

On September 30, 1987, Jeffrey Brian Ness (defendant) was convicted, after a jury trial in Isanti County District Court, of murder in the first degree in connection with the April 22, 1987 death of his father, David Ness. Defendant was sentenced to the mandatory term of life imprisonment. On appeal, defendant seeks reversal on the grounds of insufficiency of the evidence to prove premeditation and intent and error in allowing his confession into evidence. We affirm the conviction.

Until the date of the offense, Jeffrey Brian Ness defendant lived with his father in rural Isanti County near Stacey, Minnesota. Defendant, who was 19 years old at the time of the offense, had lived alone with his father since 1984 when defendant's natural mother died of cancer. The relationship between defendant and his father was strained. Witnesses testified that the deceased was very strict with defendant and provided too much supervision and direction. While defendant maintained that he and his father got along well, three witnesses testified that, on several occasions prior to the offense, defendant had mentioned wanting to kill or injure his father.

Monty Frenzel, defendant's best friend, testified that defendant spoke of killing his father "whenever he got mad." At trial, Frenzel told of four occasions when defendant had threatened to kill his father. The very first time Frenzel heard defendant mention killing his father occurred several weeks after Frenzel first met defendant while both were employed at a bird seed factory. Defendant invited Frenzel to his home during a break at work. While there, defendant told Frenzel, "This would be a nice party house * * *." and added that if he killed his dad, he would get everything —the house, the three-wheeler and the truck.

One or 2 months before the offense, defendant threatened to kill his father while he and Frenzel were in Florida on spring break. En route to Florida, defendant's truck had broken down, forcing defendant and Frenzel to hitchhike the rest of the trip. While attempting to hitch a ride outside Daytona Beach, Florida, defendant became frustrated with hitchhiking and remarked to Frenzel that they wouldn't be hitchhiking if he had his dad's truck, that if he had killed him, he would have his truck. At this time, defendant came up with the idea of using a baseball bat to kill his father. Defendant then asked Frenzel if killing his dad with a bat would be bloody, to which Frenzel replied, "Probably not. It ain't on the movies."

On a third occasion, approximately 1 week before the offense, Frenzel had met defendant to hitchhike into town to celebrate defendant's birthday. They were given a ride into town where they drove around and drank beer with the person who picked them up. When asked about the $20 he had, defendant said he had received it from his father. Defendant termed the gift "a measly 20 bucks" and added that he could have everything if he killed his father.

The last time Frenzel heard defendant mention killing his father was early in the evening of April 22, 1987, while Frenzel was visiting defendant. When Frenzel indicated that he wanted to leave to avoid defendant's father, defendant told him that

he would kill his father if Frenzel waited in defendant's bedroom.

Frenzel's testimony was supported by the testimony of his brother, Jerry Frenzel. Jerry Frenzel testified that Monty had told him, "[Defendant's] going to kill his dad, he's going to hit him over the head with a baseball bat."

Melissa Thompson and John Locke also testified that they had heard defendant threaten his father. Both were present at the home of Mavis Tacheny, the deceased's girl friend, on Easter Sunday, April 19, 1987. During the afternoon of that day, defendant told both Thompson and Locke that he hated his father and sometimes felt like "beating the shit out of him." Locke testified that defendant told him later the same day that he had gone to Florida because "I had to get away; I felt like I was going to kill my dad."

On April 23, 1987, at approximately 3:00 p.m., the Isanti County dispatcher received a 911 call from the David Ness residence. The caller identified himself as Jeff Ness and told the dispatcher that he needed help because he had just gotten home and found his dad dead. Immediately after the call was received, a four-member ambulance crew from North Branch was sent to the residence.

Upon entering the Ness home, members of the ambulance crew discovered the body of David Ness in a bedroom. The deceased's body was found lying on his bed in a fetal position with his hands covering his face. The deceased's head was covered with blood as were the bedding and the sideboard of the bed. Blood was also spattered on the walls and objects surrounding the bed. Next to the deceased's body on the bed was a baseball bat. The bat was broken and the barrel of the bat was covered in blood. Dr. McGee, the physician performing the autopsy, determined that the cause of death was "cerebral lacerations with basilar skull fractures due to blunt trauma to the head region." Dr. McGee also determined that the deceased's injuries were caused by a minimum of six blows delivered with a "great deal of force" by an object consistent with a wooden baseball bat. Dr. McGee estimated that death occurred approximately 30 minutes after the blows were received.

Investigator Kory Erickson of the Isanti County Sheriff's Department also spoke with defendant at the scene of the offense. Defendant told Erickson that, on April 22, he and his father had worked from 8:00 a.m. to 6:00 p.m. putting up fencing. At about 9:00 p.m., defendant asked if he could go into town with his father's truck. The deceased said "yes" and the defendant left. According to defendant, this was the last time he saw his father alive. After getting the truck, defendant said that he drove to St. Paul, Minnesota, to look up some friends. His friends weren't home so defendant bought some chips, parked his dad's truck and proceeded to eat the chips and drink seven or eight beers that he had brought from his father's place. A short time later, defendant fell asleep. Defendant said that he awoke at about 8:00 or 9:00 a.m. the next morning and left St. Paul. During the trip home, defendant applied for jobs in North Branch, Rush City and Chisago City. At approximately 2:45 p.m., defendant arrived home. Defendant went inside and called for his father. Getting no response, he then started looking for his father. At this time, defendant said that he noticed drawers were open and things had been pulled out. Defendant walked to his father's bedroom where he found the body of his father. Defendant then called 911 and went outside to wait.

Following this statement, Investigator Erickson asked the defendant if he would come to the sheriff's office so he could get a statement on tape. Erickson explained to defendant that coming to the station and giving the statement was voluntary. Defendant agreed to go with Erickson to give a statement. Before leaving with defendant for the Isanti County Law Enforcement Center, Investigator Erickson met with Investigator Larry Southerland, also of the Isanti County Sheriff's Department, and briefed him on what he knew and how

the investigation should proceed. It was decided that Southerland would talk with neighbors of the deceased, and Erickson would bring defendant to the station for a statement.

Upon arrival at the Isanti County Law Enforcement Center in Isanti, Minnesota, Erickson brought defendant to a small room in the administrative wing of the building. At 6:25 p.m., shortly after he arrived, defendant gave the first of three statements to police. Even though defendant was not under arrest at this time, he was read his constitutional rights before his first taped statement. Defendant proceeded to tell virtually the same story he had told Investigator Erickson at the crime scene.

While Investigator Erickson was taking the first statement from defendant, Investigator Southerland spoke with Ness's neighbors. The neighbors told Investigator Southerland that, on the day David Ness was killed, defendant had been with another youth. Though the neighbors did not know the young man's name, they directed Investigator Southerland to where he lived. Investigator Southerland drove to this address where he spoke with Monty Frenzel. Frenzel acknowledged that he had been with defendant on the date of the offense. Because this contradicted the story defendant had given at the crime scene, Investigator Southerland decided to bring Frenzel in to get a taped statement. As Southerland and Frenzel were leaving Frenzel's home, Frenzel spoke of two guns defendant had given him to hide. Frenzel then directed Southerland to the location in the woods where he had hidden the guns. There, two small caliber .22 guns wrapped in a blanket were recovered.

In Frenzel's first statement to police, he denied that defendant had killed his father. Shortly after this first statement, Frenzel's mother, Carmen Williams, arrived at the law enforcement center after being told that her son had been brought there. Mrs. Williams asked if she could speak with her son and was allowed to do so. After speaking with his mother, Frenzel informed Southerland that he wished to give a second statement. In this second statement, Frenzel admitted that he had lied when he said defendant had not killed his father and that he did so because he did not want to get defendant in trouble.

At trial, Frenzel testified that, in the early evening of April 22, 1987, he had gone to defendant's house to visit. After being there a short time, Frenzel told defendant that he wanted to leave to avoid the father, who did not like Frenzel and did not allow defendant to see him. Defendant told Frenzel that if he waited in his bedroom, defendant would kill his father. Frenzel became nervous at this point, fearing that defendant might actually kill his father so he left the house on defendant's three-wheeler. Later that evening while Frenzel was at home, he received a call from defendant, who told Frenzel to stay up until midnight and wait for him to call back because he was going to get his dad's truck that night. Near midnight, defendant called Frenzel back and told him, "I did it." Frenzel asked, "You did what?" and defendant replied, "I killed my dad." Defendant then told Frenzel that he would be over in 15 minutes with his father's truck. In approximately 15 minutes, defendant arrived at Frenzel's home in his father's truck.

Monty Frenzel's mother corroborated her son's testimony up to this point, stating that, on April 22, defendant had called her son several times. Mrs. Williams said that she was curious because, the second time defendant called, they spoke a shorter time than normal. When Mrs. Williams asked her son about the call, he told her that defendant was going to get his dad's truck and come over and pick him up. Williams thought it was strange that defendant would have his father's truck since she knew he was not permitted to use it, but she hoped nothing was wrong. After she went back to bed, she heard a truck pull up. Her son said goodbye and left, not returning home until the next day.

After leaving Frenzel's house, defendant and Frenzel drove to Cambridge, Minneso-

ta, to buy cigarettes. While in Cambridge, Frenzel asked defendant why he had killed his father. Defendant replied "[f]or a measly 200 bucks," referring to the money in the deceased's wallet which defendant had taken. Besides the $200, defendant found several checks in his father's wallet, but did not cash them for fear they would be traced.

When Frenzel told defendant that he did not believe defendant had actually killed his father, defendant drove back to his house so he could show Frenzel what he had done. They entered the house. While Frenzel was in the hallway to the deceased's bedroom, he heard a gurgling noise in the room. Defendant said, "He's still alive." and Frenzel quickly left the house and vomited outside. When Frenzel returned to the house, defendant was gathering clothing. Frenzel went to the kitchen, took some beer and then he and defendant left the house. Defendant re-entered the house; when he came out, he said that he had put a blanket over his father's head. They then left the house and drove to Forest Lake. After getting gas in Forest Lake, they began driving towards Minneapolis, Minnesota. Upon arriving in either Minneapolis or St. Paul, they attempted to buy two bus tickets to California, where Frenzel had an uncle who would give them jobs. They could not, however, get the tickets because they did not have enough money. They then decided to drive to California and left Minneapolis. According to Frenzel, the plan was to take Interstate 94 for awhile and then cut down to California.

Just before they reached North Dakota, Frenzel testified that, because he did not want to get caught out of state with defendant, he talked defendant into returning home, suggesting that defendant try to make it look like a burglary. Defendant agreed that this was a good idea so they turned around and drove back. Because Frenzel did not want to go to defendant's house, defendant drove him home. Before leaving, Frenzel took the beer, his clothes, and two of the deceased's guns that were in the pick-up. Frenzel hid the guns in the woods as he did not want to bring them home.

Because of the difference between defendant's and Frenzel's stories, a second statement was taken from defendant by Investigator Southerland at 11:37 p.m. on April 23. Between this time and the conclusion of the first statement at 7:05 p.m., defendant had remained at the law enforcement center. Defendant testified at his omnibus hearing that he asked if he could leave several times, but was told that the news media was at the law enforcement center and they would prefer that he stay until the media left. Defendant agreed to stay because "he didn't want to be on TV."

Before taking the second statement from defendant, Investigator Southerland reminded defendant of his rights, which had been read to him earlier, and asked if he still understood them. Defendant said that he remembered and understood those rights; however, still wished to speak to the police. When told that police had spoken with Monty Frenzel, defendant admitted that the two had been together during the evening of April 22. Defendant also admitted that he had lied in his first statement to police when he said that he and his dad watched television until 9:00 or 10:00 p.m. on April 22. Defendant said that his father had been in the cities visiting friends until 11:00 p.m. when he returned home. According to defendant, his father, "drunk like usual," watched TV for half an hour and then went to bed. At about 11:45 p.m., defendant slipped into his father's room and took the keys to his father's truck. After stealing the keys, defendant called Frenzel to tell him that he had stolen his father's truck. Defendant then sneaked outside and drove the truck to Frenzel's. Defendant said that he and Frenzel were planning to go to California. Defendant admitted that he had removed his father's guns from the pick-up and had given them to Frenzel. However, defendant denied killing his father and returning to the house with Frenzel. When Investigator Southerland informed defendant that his statements contradicted with Frenzel's and that Frenzel had gotten sick at defendant's

house, defendant replied "bullshit," "I ain't saying nothing" and "stop the tape so I shut up [sic]." Investigator Southerland immediately stopped the tape at 11:49 p.m. and ceased questioning defendant. After stopping the tape, Investigator Southerland remained in the room gathering the tape-recording equipment and case files. While Southerland was cleaning up, Isanti County Sheriff William Schultz entered the room after being summoned by Investigator Erickson to watch defendant. There was some dispute as to what transpired at this time. Defendant testified at his omnibus hearing that about 30 seconds after the tape was stopped, Sheriff Schultz came into the room and asked him, "Are you sure you don't wish to say anymore?" Defendant then asked, "[W]hat would happen if I say more?" to which Sheriff Schultz replied, "I'm not sure exactly * * * what we could do, but I think we might be able to help you if you would say something. It would sure help your mind if you would say something."

Sheriff Schultz denied initiating the conversation with defendant and promising to help him if he confessed. According to Sheriff Schultz, he was asked by Investigator Erickson to watch the defendant. When he arrived in the room where defendant was being interrogated, Investigator Southerland told him that defendant was being hard to talk to, to which Schultz replied, "I really don't understand that." Schultz said that defendant heard this exchange and asked, "What would happen if I did?" Schultz told defendant that they "couldn't cut him any slack," but that it would be better if defendant talked and he should get it off his mind. Schultz continued speaking and told defendant that he was only 18 years old and would have a long time to think about it and that it would bother him for awhile. Defendant then became nervous and teary-eyed and asked what would happen if he had killed his father. Sheriff Schultz replied that it would be serious, but it would be easier on his mind if he talked about it. Schultz then told defendant that he should talk with Investigators Erickson and Southerland, who at this time were in the room.

Schultz asked defendant if he wanted to talk with both men or only one of them. Defendant did not reply so Schultz asked if he wanted to talk with Southerland, to which defendant replied, "Yes."

At 11:55 p.m., 6 minutes after the conclusion of the second statement, defendant gave a third statement to Investigator Southerland. Defendant first acknowledged that he understood his *Miranda* rights, that he had not been threatened or promised anything and that he was talking to Investigator Southerland under his own free will and choice. In his third statement to police, defendant admitted that, on the evening of April 22, he had killed his father with a baseball bat. Defendant told Investigator Southerland that, on April 22, his father had come home at 11:30 p.m. and went to bed soon after. Defendant then called Monty Frenzel and told him that he was going to get the keys to his dad's truck from underneath his dad's mattress. Defendant then went into his father's room and hit his father three or four times on the head with a baseball bat, breaking the bat in the process. Defendant said that his intent in striking his father on the head was "to get the keys."

Defendant first claimed that Monty Frenzel was with him when he killed his father, but later admitted that was not true. Defendant said that, after he killed his father, he and Monty began driving to California, but he decided to turn back because, according to defendant, he "couldn't deal with it. I was going to turn around and call the ambulance 'cause when we left him he was breathing like he was brain dead or something. I thought maybe he could still live."

Defendant denied having ever mentioned killing his father to anyone. Defendant said that it was Monty's idea to kill his father so they could take his truck to California.

At the conclusion of the third statement, defendant was booked and jailed at the Isanti County jail. When defendant was booked, several items of defendant's clothing were seized, including defendant's short-sleeved T-shirt. On the back of this

shirt, police found two blood spots near the left shoulder which were consistent with the blood type of the deceased. Erchal Springer, an employee of the Bureau of Criminal Apprehension, testified that it was common for persons swinging bloody objects to get blood on their backs.

Several weeks after defendant was arrested, he encountered Monty Frenzel, who was in the Isanti County jail on a probation violation. According to Frenzel, defendant asked Monty if he had told on him and Frenzel replied, "I had to." Defendant then told Frenzel, "Well, if I plead insane at the moment, I might get away with six months." Defendant then told Frenzel, "Well, why don't you just tell them I was on acid or something."

An omnibus hearing was held on August 7, 1987, to decide several questions, including whether defendant's third statement should be suppressed. In its findings of fact, the Isanti County District Court adopted Sheriff Schultz's version of the events surrounding the taking of defendant's third statement and ruled that the statement was admissible into evidence.

On appeal, defendant raises two issues:

I. Was the evidence sufficient to prove that the defendant killed his father intentionally and with premeditation?

II. Was defendant's fifth amendment right to remain silent violated when, moments after defendant exercised his right to remain silent, questioning resumed and he subsequently confessed?

On appeal, defendant first seeks reversal of his conviction on the grounds that the evidence was insufficient to support a conviction for first-degree murder. Defendant does not dispute that he caused the death of his father. What the defendant does dispute is the jury's finding that the state proved beyond a reasonable doubt that he intentionally and with premeditation killed his father. On review, assuming that the jury acted with due regard for the presumption of innocence and the necessity of overcoming it by proof beyond a reasonable doubt, this court must not disturb the jury verdict if the jury could have reasonably concluded that defendant was guilty. *State v. McCullum*, 289 N.W.2d 89, 91 (Minn.1979) (citing *State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965)).

Minn.Stat. § 609.185(1) (1986) provides: "Whoever does any of the following is guilty of murder in the first degree * * *: (1) Causes the death of a human being with *premeditation* and with *intent* to effect the death of the person or of another * * *." (Emphasis added.) Before a person can be convicted of first-degree murder, all elements of first-degree murder, including premeditation and intent, must be proven beyond a reasonable doubt. *State v. Andrews*, 388 N.W.2d 723, 727 (Minn. 1986).

Because intent and premeditation are subjective states of mind, they are generally proved only by inferences drawn from a person's words or actions in light of all circumstances. *Andrews*, 388 N.W.2d at 728. This court has held that events before and after a death can support an inference that a defendant acted with premeditation and intent. *Id.* at 728 (citing *State v. Kirch*, 322 N.W.2d 770, 773–74 (Minn.1982); *State v. Hardimon*, 310 N.W.2d 564, 566 (Minn.1981)). The events occurring both before and after the defendant's killing of his father clearly support such an inference.

The relevant events occurring prior to the murder consisted primarily of defendant's threats to harm his father. In arguing that these threats do not establish premeditation and intent, defendant attempts to cast doubt on the veracity of Monty Frenzel's testimony. However, on review, the court "must assume that the jury believed the State's witnesses and disbelieved everything which contradicted their testimony." *Andrews*, 388 N.W.2d at 728 (citing *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn.1980)).

Defendant also argues that, even if Frenzel is to be believed, defendant's threats against his father were merely "manifestations of impotent adolescent frustration aimed at an overwhelming authority fig-

ure" and thus were not indicative of any intent or premeditation to kill. However, the fact that defendant actually carried out these threats negates this argument.

The specificity of defendant's threats, coupled with the fact that the threats were made near the time of his father's death, further dispel defendant's arguments that the threats were adolescent ravings. Defendant specifically spoke of using a baseball bat to kill his father in one of the threats. Defendant also mentioned in several of the threats that he made to Frenzel that, after killing his father, he would take his father's truck. In addition to specificity, several of the threats were made near the time of the offense. The threats made on April 19 at the Easter Sunday gathering were made only 3 days before the murder. On the day of the offense, only hours before defendant killed his father, he told Monty Frenzel that if Frenzel stayed in defendant's room, he would kill his dad. The fact that defendant specified how he was going to kill his father close to the day he actually killed him enabled the jury to infer that defendant had engaged in some planning before the murder.

Defendant's actions after killing his father also support an inference of intent and premeditation. First, despite defendant's claim that he only intended to knock his father unconscious, defendant struck his father with a baseball bat at least six times with a great deal of force. The amount of blood alone must have indicated to defendant that he was doing more than rendering his father unconscious. Second, after inflicting these blows on his father, defendant had little compunction about bringing Frenzel to his home. If defendant believed that he had only knocked his father unconscious, he would have been more apprehensive about returning home. Third, when defendant did return to his home with Frenzel, he made no attempt to assist his father in any way despite the severity of his father's wounds and the amount of blood present. Rather, defendant began preparations for his escape to California. This preparation for escape is inconsistent with the intent only to injure and not kill. *See, e.g., Andrews,* 388 N.W.2d at 728–29.

Finally, when defendant heard "gurgling" noises from his father's room, he replied, "He's still alive." This would seem to indicate that defendant was surprised that his father was not dead.

Also relevant to the issue of intent and premeditation is the manner in which defendant killed his father. While death from a series of blows cannot alone support a finding of premeditation and intent, *State v. Swain,* 269 N.W.2d 707, 714 (Minn. 1978), it certainly can be considered by the jury as supporting an inference that defendant premeditated to act as he did. *State v. Martin,* 261 N.W.2d 341, 345 (Minn.1977). The brutal manner in which defendant killed his father—six hard blows to the head with a baseball bat—could reasonably support an inference by the jury that the killing was intentional. *See, e.g., Martin,* 261 N.W.2d at 345. This is not a case where the repeated blows are the only evidence of intent and premeditation as in *Swain.* Here, the defendant's actions before and after the death of his father, coupled with the manner in which he killed his father, readily support the trial court's determination that defendant intentionally and with premeditation killed his father.

■■■ We need not address the question of whether defendant's confession was improperly admitted into evidence. The fact that, at trial, defendant admitted killing his father and only claimed a lack of intent and premeditation makes the admission of his confession irrelevant. Moreover, the independent evidence of guilt, including the testimony of defendant's best friend and defendant's own contradictory statements and actions, was so overwhelming that any error in admitting the confession was not prejudicial. *See State v. Olson,* 326 N.W. 2d 661, 663 (Minn.1982).

The conviction of first-degree murder is affirmed.