STATE of Minnesota, Respondent,

v.

James NMN THOMAS, Appellant.

No. C5–98–1003.

Supreme Court of Minnesota.

March 25, 1999.

John M. Stuart, Minnesota State Public Defender, Minneapolis, for appellant.

Michael Hatch, Attorney General, St. Paul, and Michael Freeman, Hennepin County Attorney, Paul R. Scroggin, Assistant Hennepin County Attorney, Minneapolis, for respondent.

## OPINION

PAGE, J.

Appellant James Thomas was found guilty of one count of first-degree premeditated murder in violation of Minn.Stat. § 609.185(1) (1998) for the death of 14–month–old Reneshia Featherson and one count of second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1) (1998) for the death of Reneshia's mother, Tina Simmons, after a bench trial in Hennepin County District Court. Thomas was sentenced to life imprisonment for the first-degree murder conviction and a consecutive 306–month sentence for the second-degree murder conviction. In this direct appeal, Thomas challenges the sufficiency of the evidence supporting the first-degree murder conviction. In his pro se supplemental brief, Thomas also raises the issues of whether he was denied effective assistance of trial counsel and whether the trial court abused its discretion when it imposed unfair sentences for his conviction. We affirm.

Evidence presented at trial established the following facts. In the summer and early fall of 1994, Thomas lived in an apartment with his girlfriend, Dorcella Hicks, in north Minneapolis. Thomas and Hicks shared the apartment with some of Hicks' children and an individual named Tommie Lee McNeal. Simmons and her daughter, Reneshia, lived in a different apartment in the same building.

On October 13, 1994, police were called to the apartment building because of the odor coming from Simmons' apartment. Inside the apartment, they found Simmons' and Reneshia's dead bodies. Simmons badly decomposed body was in the bedroom on the bed and Reneshia's body was on the floor next to the bed. Autopsies were performed on both bodies. Simmons' autopsy revealed that she died of sharp force and asphyxial injuries. Simmons had three cut wounds on her left wrist, the most significant of which went through the radial artery and two tendons. The wound on Simmons' neck extended in depth from the jaw bone to the back of the mouth. The medical examiner testified that this wound was significantly altered by decomposition, in particular insect activity. Reneshia's autopsy established that she lost 4 pounds and 14 ounces before she died from dehydration and neglect. Testimony established that it generally takes three to four days for a person to die from dehydration. The medical examiner concluded that Reneshia died after her mother because there was less decomposition and no significant insect activity.

The murders went unsolved until Thomas' arrest on August 1, 1997. According to statements Thomas made to the police after his arrest, he and Simmons, on or about September 25, 1994, spent some time drinking together outside their apartment building and then went to Simmons' apartment and engaged in sexual intercourse. Reneshia was present in the apartment. After having sex, Simmons threatened to tell Hicks about their sexual encounter unless Thomas gave

her $250. Thomas got a knife, and cut Simmons' left wrist and throat and then put a pillow over her face because Simmons was moaning. After removing the pillow, Thomas put some towels or rags on Simmons' neck to stop the bleeding, and then left Simmons' body and Reneshia in the apartment. Thomas returned the following day to clean up the apartment. He gave Reneshia a bottle of milk, took a radio, a $79 public assistance check, and the keys to the apartment, before leaving and locking the door behind him.

McNeal and Hicks were key witnesses for the state at Thomas' trial. They both testified about conversations they had with Thomas regarding Simmons' and Reneshia's deaths. According to McNeal, the first of three such conversations occurred before their bodies were discovered. In that conversation, Thomas, referring to Simmons, told McNeal that he "killed the girl in the basement" by putting a pillow over her, tying her up, and gagging her. The reason he gave McNeal for killing Simmons was that she had threatened to tell Hicks about their sexual encounter unless he gave her $250 or $350. Thomas also told McNeal that after killing Simmons he stole a radio and a public assistance check, which he asked McNeal to help him cash. In addition, he told McNeal that he went back to the apartment to feed the baby every day but stopped when the odor from Simmons' decomposing body "got so bad" that he started to get "scared." The second conversation took place in July of 1995. In that conversation, Thomas in effect told McNeal that nothing would happen to him as a result of the murders because of the passage of time. Thomas' third conversation with McNeal about the deaths occurred on February 14, 1997. Hicks and her cousin, Diane Williams, were also present during this conversation. McNeal testified that during this conversation Thomas again said that he killed Simmons because she had tried to blackmail him, that he fed the baby until the odor got too strong, and that he was not worried about being caught because of the passage of time. When McNeal asked Thomas why he did not "leave the door cracked or put [Reneshia] out in the hallway or something," Thomas did not answer.

Hicks testified that sometime during July of 1995 she confronted Thomas about statements McNeal had made regarding Thomas having killed Simmons. According to Hicks, Thomas said, "nobody got nothin' on me, nobody got no proof." Hicks also testified that during the February 14 conversation with Thomas, McNeal and Williams, she heard McNeal ask Thomas, "what about that little girl?" to which Thomas replied he "didn't care, that's too bad."

At his trial, Thomas was represented by a court appointed attorney. After discussing it with his attorney, Thomas waived his right to a jury and agreed to a court trial. That waiver was put on the record by the trial judge. The record indicates that Thomas acknowledged that he talked with his attorney over a period of several months about whether or not he should waive his right to a jury trial; that he understood that the decision to waive the jury trial was his to make; that he did not feel compelled to waive his right to a jury trial; and that the decision to waive the jury trial was his. Thomas also, on the record, waived his right to testify on his own behalf at his trial. At the time he waived his right to testify, Thomas acknowledged that his attorney had advised him of the advantages and disadvantages of testifying; that it was his decision not to testify; and that he understood that the trial court could not make any adverse inferences from his silence.

 The first issue for our review is whether the evidence at trial was sufficient as a matter of law to sustain Thomas' first-degree premeditated murder conviction for the death of Reneshia Featherson. Thomas argues that the evidence did not support his conviction for first-degree premeditated murder because the state did not prove that he acted with premeditation and intent when he let Reneshia die of dehydration and neglect. In reviewing a sufficiency of the evidence claim, this court views the evidence in the light most favorable to the verdict and assumes that the fact finder disbelieved any testimony conflicting with the result reached.[1] The verdict will be upheld if the

---

1. *See State v. Atkins*, 543 N.W.2d 642, 646 (Minn. 1996) (applying standard to jury verdict); *State v.* *Cox*, 278 N.W.2d 62, 65 (Minn.1979) (applying the same standard to a bench trial).

fact finder, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, could reasonably have found the defendant guilty of the offense charged.[2] The state of mind of a defendant is generally not susceptible to proof by direct evidence.[3] Circumstantial evidence must be consistent with the hypothesis that the defendant is guilty and inconsistent with any other rational hypothesis other than guilt.[4]

■ For evidence of premeditation to be sufficient, the state must prove beyond a reasonable doubt that the accused considered, planned, or determined to cause the death of a human being.[5] Premeditation differs from intent because it requires that some amount of time pass between the formation of the intent to kill and the carrying out of the act.[6] "[P]remeditation need not involve 'extensive planning and calculated deliberation' * * * [and] can be formulated virtually instantaneously * * *."[7] To determine premeditation, we look to (1) the defendant's actions prior to the actual killing to determine if planning activity occurred, (2) facts from which motive may be inferred, and (3) facts about the nature of the killing from which it may be inferred that the defendant must have intentionally killed according to a preconceived plan.[8]

Thomas argues that Reneshia's death was not premeditated because his crime was one of omission rather than commission. We disagree. The facts contained in this record indicate that Thomas engaged in planning activity, had a motive to kill, and in fact did kill according to a preconceived plan as surely as if he had intentionally put a bullet in Reneshia's head.

■ Thomas' actions leading to Reneshia's death show planning activity and that he considered the consequences of carrying out those plans. Thomas killed Simmons, Reneshia's only means of care and support, and then left her alone in the apartment with Simmons' body. He returned to the apartment on at least one and possibly more occasions to remove evidence that might implicate him in Simmons' death and to feed Reneshia. When the odor from Simmons' decomposing body became too strong, rather than continuing to feed Reneshia, putting her in the hallway, or leaving the door open, Thomas made a conscious decision to lock the door to the apartment with Reneshia inside and not go back because he was afraid it might lead to his arrest for Simmons' death.

Further, Thomas had a motive to let Reneshia starve to death. He needed to delay the discovery of Simmons' body to give him an opportunity to cover his tracks. By leaving the apartment and locking the door, Thomas successfully delayed discovery of Simmons' body by ensuring that the baby could not accidentally get out and no one could get in the apartment.

Finally, there was sufficient evidence from which the trial court could infer that Thomas intentionally killed Reneshia according to a preconceived plan. Intent "means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result."[9] Thomas' actions, as described above, establish that he had a plan and understood that, if successful in carrying it out, Reneshia would die because she would be without care and nourishment.[10] These actions guaranteed her death. Therefore, we conclude that

2. *Atkins*, 543 N.W.2d at 646.

3. *See State v. Moore*, 481 N.W.2d 355, 361 (Minn. 1992).

4. *Id.*

5. *See* Minn.Stat. § 609.18 (1998).

6. *See Moore*, 481 N.W.2d at 361.

7. *State v. Buntrock*, 560 N.W.2d 383, 388 (Minn. 1997) (quoting *State v. Lloyd*, 345 N.W.2d 240, 246 (Minn.1984)).

8. *Moore*, 481 N.W.2d at 361 (quoting W. LaFave & A. Scott, *Handbook on Criminal Law* § 73 at 564–65 (1972)).

9. *See* Minn.Stat. § 609.02, subd. 9(4) (1998); *see also State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997) (stating that "the [fact finder] may infer that a person intends the natural and probable consequences of his actions").

10. *See State v. Dimmick*, 586 N.W.2d 127, 130 (Minn.1998) (considering defendant's actions in preventing discovery of a stabbing victim in affirming conviction for first-degree premeditated murder).

the evidence of premeditation and intent was sufficient to sustain Thomas' conviction of first-degree murder in violation of Minn.Stat. § 609.185(1).

 Thomas next claims that he was denied effective assistance of trial counsel. He bases this claim on his assertion that his trial counsel convinced him to waive both his right to a jury trial and his right to testify on his own behalf. The record belies Thomas' assertion. The record reflects that Thomas alone, after discussing the ramifications with his trial counsel, made the decisions to waive his right to a jury trial and his right to testify on his own behalf. It also reflects that Thomas understood the nature of the rights he was waiving and that his trial counsel, while advising him of the advantages and disadvantages, did not coerce him into waiving those rights. Thus we conclude that Thomas' waiver of his rights was knowing, intelligent, and voluntary, and that Thomas' claim that he was denied effective assistance of counsel has no merit.[11]

Thomas' last claim is that the length of his sentence is unfair and may have been influenced by race. Thomas is African American; the trial court judge is not. Thomas' belief that his sentence was influenced by race is based on comments he received from fellow inmates that the judge who handled his trial is "dirty" and "a racist." We will uphold a trial court's sentencing determination absent a clear abuse of discretion.[12] We have thoroughly reviewed the record, and conclude that there is nothing contained in it that even remotely suggests that the trial court abused its discretion. As for Thomas' claim, based on what he was told by fellow inmates, that his sentence was influenced by race, we are loathe to dignify it with a response. It is enough to say, as we have in the past, that "[g]eneral allegations of error, without detailing specific factual or legal errors, do not aid our review of the lower court's proceedings * * *. Therefore, we will not consider any claim lacking supporting argument or authority un-

less prejudicial error appears obvious upon inspection of the record."[13]

Affirmed.

---

**11.** *See State v. Powell,* 578 N.W.2d 727, 732 (Minn.1998).

**12.** *See State v. Brom,* 463 N.W.2d 758, 765 (Minn.1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991).

**13.** *See State v. Bowles,* 530 N.W.2d 521, 525 n. 1 (Minn.1995) (citing *State v. Lipscomb,* 289 Minn. 511, 513, 183 N.W.2d 790, 792 (1971)) (discussing defendant's contention that he was subjected to a "racist proceeding").