**STATE of Minnesota, Respondent,**

v.

**Roberto LOPEZ–RIOS, Appellant.**

**No. C9–01–1372.**

Supreme Court of Minnesota.

Oct. 9, 2003.

Office of the Minnesota State Public Defender, Sharon E. Jacks, Assistant State Public Defender, Minneapolis, MN, Pro

Se, Roberto Lopez–Rios, St. Cloud, MN, for Appellant.

Michael A. Hatch, Minnesota Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Roberto Lopez–Rios was convicted and sentenced in Hennepin County District Court for the crimes of first-degree murder committed for the benefit of a gang and drive-by shooting committed for the benefit of a gang. On appeal, Lopez–Rios alleges, among other things, error in the admission of expert testimony relating to criminal street gangs, error in the failure to provide a limiting jury instruction, and prosecutorial misconduct. We affirm as modified.

This case arises out of allegations that appellant Roberto Lopez–Rios was involved in a criminal street gang-related drive-by shooting in retaliation for an earlier shooting incident purportedly committed by a rival gang. Lopez–Rios did not testify at his trial nor did he call any witnesses. Francisco Vargas, a Latin Kings gang member, was present during the shootings and the events leading up to the shootings. Vargas pleaded guilty to second-degree murder for the benefit of a gang and second-degree assault for his role in the crimes for which Lopez–Rios was charged. As part of his plea agreement, Vargas testified at Lopez–Rios's trial. Vargas's testimony provided information on the events that led up to the shootings and about the shootings.

On the evening of December 2, 2000, Vargas, who was then 18 years old, left a dance near Lake Street and Portland Avenue in Minneapolis to go to a party on Bloomington Avenue and Twenty-fourth Street. As Vargas and some other Latin Kings gang members were waiting for a bus, someone from a passing car shot at them, wounding two Latin Kings members—a man named Ganbino, who is Lopez–Rios's cousin, and another man called Gallo. An unidentified person told Vargas that the shooters were members of the 18th Street gang.

Two vehicles, a truck and a red four-door Lincoln Continental occupied by two Sureño gang members, Hymie Hernandez and Issodoro Nava, stopped at the shooting scene and were used to transport the victims to the Hennepin County Medical Center (HCMC). Ganbino rode with Vargas in the truck and Gallo rode in the Continental. At HCMC, Vargas and Hernandez brought the victims inside the hospital and left. Vargas and Hernandez then walked to a payphone near the Metrodome where Hernandez called Nava, the Continental's driver, to ask that he pick them up. Nava picked up the two men and they proceeded to the home of then 16–year-old Lopez–Rios to tell him and his family that Ganbino was in the hospital. After relaying what had happened, Vargas asked if Lopez–Rios wanted to go with them to see their other friends at the "blue house" on Bloomington and Twenty-fourth. Lopez–Rios said he was not ready to leave his home at that point, so Vargas and the Sureños went to the blue house without him.

On the way to the blue house, Hernandez asked Vargas if he or the other Latin Kings wanted to "do something." Hernandez said he knew where the 18th Streeters lived; and if the Latin Kings wanted to "do something," he could find a gun. Var-

gas responded that he needed to see his friends first. Upon arriving at the blue house, Vargas was told that his friends had left for Lopez–Rios's home, so Vargas, Hernandez, and Nava returned to Lopez–Rios's home. As Vargas approached the home, Lopez–Rios and Latin Kings member Arturo Montano came out. Vargas told Lopez–Rios that Hernandez and Nava would help find the 18th Streeters to pay them back for shooting Lopez–Rios's cousin and the other Latin Kings gang member. Lopez–Rios said he was ready to "get out."

Lopez–Rios and Montano got into the Continental with Vargas, Hernandez, and Nava. Nava was the driver, Hernandez sat in the front passenger seat, Vargas was seated behind Hernandez, Lopez Rios was seated behind Nava, and Montano was seated between Lopez–Rios and Vargas. Hernandez asked Lopez–Rios, Montano, and Vargas if they wanted to "do something"; they responded that they did, and the group proceeded to look for "some 18ths." As the group neared the area where the 18th Streeters lived, Lopez–Rios produced a .380 semiautomatic handgun. He said that if the 18th Streeters were found on his side of the car, he wanted "to use the gun." If the 18ths were on the other side, then Vargas would "do it."

Shortly after midnight on December 3, the group spotted 17–year–old Ernesto Ayala and then 19–year–old Jose Artega walking on the sidewalk toward a fourplex apartment building near 57th Street and 33rd Avenue. Artega lived in a nearby apartment and the two of them were walking from Artega's place to Ayala's apartment. Both Ayala and Artega were identified as members of the 18th Street gang and, as the Continental approached Ayala and Artega, the two men were on the right side of the car—Vargas's side. Lopez–

Rios started to hand the gun to Vargas, but dropped it on the floor between Montano's legs. Montano picked up the gun as Vargas rolled down the rear window so that the gun could be used to shoot out the window. Hernandez then said it would be better to open the door. Vargas opened the door, and Montano crossed over Vargas and got out of the car. Montano started shooting, wounding Ayala. Ayala then fired two shots from a revolver, one of which struck the rear passenger panel of the car.

As the exchange of gunfire ensued, Vargas moved to the middle of the back seat to make room for Montano. Montano then returned to the car. Ayala, who was shot twice, managed to get over a fence and into the backyard of his apartment building where he collapsed and died. An autopsy revealed that Ayola died as the result of two bullet wounds, one of which hit his aorta. The occupants of the Continental then drove away from the scene, unaware of Ayala's death. Vargas said that once they got on the freeway, everyone in the car, including Lopez–Rios, celebrated by clasping hands in a gesture similar to a high five.

Artega survived the shooting and testified at Lopez–Rios's trial. Artega stated that he noticed the Continental as it came up the street and saw it stop. The car's occupants were staring at him and were making "movements," like opening the doors. Becoming concerned, Artega told Ayala to run, to follow him, and then heard gunshots coming from two guns as he ran. Artega ran for several blocks, sat in a park for a while, and eventually returned to the area where the shooting occurred. When he got back to the shooting scene, he talked with one of the investigators who had responded to a homicide call.

Later that morning, Vargas went to the hospital to visit the Latin Kings who were

the victims of the first shooting. Lopez Rios also was at the hospital. By this time, investigators looking into the shootings had already interviewed the Latin Kings victims. The Latin Kings told Vargas that Ayala had died. Alfonso Martinez, a Latin Kings member not involved in the shooting, testified that while he was at the hospital, he heard Lopez–Rios tell his cousin that he had used his own bullets and "got [the 18th Street] back." Sometime later that day, Lopez–Rios and some other Latin Kings gang members were driving around, "cruising" to find more 18th Streeters.

During their investigation, the police recovered from the crime scene six spent cartridge casings and a bullet fragment, all consistent with having been fired from a .380 semiautomatic. They also found a .22 Smith and Wesson six-shot revolver with two empty casings and four live rounds in the cylinder. This gun was found hanging out of Ayala's right pocket. The police located the red Continental. However, Nava, the vehicle's driver, was in Mexico and the police interviewed him there. The police eventually located and interviewed Vargas, who confessed that he was in the car that was involved in the shooting.

Lopez–Rios was arrested and charged with the murder. He was subsequently indicted by a grand jury for first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2002); first-degree premeditated murder committed for the bene-

fit of a gang, Minn.Stat. §§ 609.229, subd. 2 (2002), and 609.185(a)(1) (2002); first-degree murder while committing a drive-by shooting, Minn.Stat. § 609.185(a)(3) (2002); first-degree murder while committing a drive-by shooting for the benefit of a gang, Minn.Stat. §§ 609.229, subd. 2 (2002), and 609.185(a)(1) (2002); second-degree assault, Minn.Stat. § 609.222, subd. 1 (2002); second-degree assault committed for the benefit of a gang, Minn.Stat. §§ 609.229, subd. 2 (2002), and 609.222, subd. 1 (2002); drive-by shooting, Minn. Stat. § 609.66, subd. 1e(b) (2002); and drive-by shooting committed for the benefit of a gang, Minn.Stat. §§ 609.229, subd. 2 (2002), and 609.66, subd. 1e(b) (2002).[1]

At Lopez–Rios's trial, Ayala's girlfriend testified that Ayala grew up in California, was a member of the 18th Street gang, and had a tattoo on the back of his neck that said "Eighteen." The girlfriend of Ayala's roommate testified that Ayala's roommate was from Mexico, was also an 18th Street gang member, and that the area around Ayala's home was an area in which 18th Streeters would "hang out." Artega testified that he came from Mexico, was a member of the 18th Street gang, and that the 18th Street gang name came from a gang in Los Angeles. He talked about how he noticed the Continental as it traveled toward him and Ayala; and when asked why he ran, he said that it was late, the car stopped by him, the passengers in

1. A criminal gang is
 [A]ny ongoing organization, association, or group of three or more persons, whether formal or informal, that:
 (1) has, as one of its primary activities, the commission of one or more of the offenses listed in section 609.11, subdivision 9;
 (2) has a common name or common identifying sign or symbol; and
 (3) includes members who individually or collectively engage in or have engaged in a pattern of criminal activity.

 Minn.Stat. § 609.229, subd. 1 (2002). A crime is committed for the benefit of a criminal gang when a person commits a crime "for the benefit of, at the direction of, in association with, or motivated by involvement with a criminal gang, with the intent to promote, further, or assist in criminal conduct by gang members[.]" Minn.Stat. § 609.229, subd. 2 (2002).

the car were staring at him and making movements, and "I'm in a gang and I see that they are Mexican."

Vargas testified pursuant to his plea agreement under which the state dismissed first-degree murder charges in exchange for a guilty plea to second-degree murder for the benefit of a gang and second-degree assault, a reduced sentence, placement in a safe prison, and truthful testimony at Lopez–Rios's trial. Vargas, who went by the street name of "Spooky," admitted that he was a member of the Latin Kings and testified that it was common for gang members to have street names. He said that Lopez–Rios's street name was "Little Chucky." Vargas identified Ganbino, a/k/a "Grandpa," Gallo, and Montano, a/k/a "Sleepy," as Latin Kings gang members and said that Latin Kings "hang out" with the Sureños gang.

Three other witnesses also admitted that they were members of the Latin Kings. One of these witnesses, known by the street name of "Baby King," explained how he got out of the Latin Kings gang by being "jumped," i.e., beaten up by other gang members in order to be permitted to leave. Another Latin King testified that the Latin Kings would frequently go "cruising" for enemies, like the 18th Street gang, go up to them, ask them "what's up and what you claim," and occasionally fight them. The witness also said that after visiting the Latin Kings victims in the hospital on December 3, 2000, more than three Latin Kings went out cruising to look for 18th Streeters.

The state called police investigator Donald Bautista to testify as an expert on criminal street gangs. Bautista had been assigned to the Minnesota Gang Strike Force (MGSF) since its inception in 1997. Before the MGSF assignment, Bautista spent 17 years as a high-risk entry officer in Minneapolis, serving numerous search warrants, most of which involved gang crimes. Once on the MGSF, Bautista received local and federal training on gang trends, specializing in the area of Hispanic gangs; and he personally investigated gang-related crimes and arrested and interviewed gang members. He testified that one of the primary responsibilities of the MGSF involved the identification of gang members, and he said that they "profile" them. To determine gang membership, MGSF used its ten-point gang identification criteria.[2] In Minnesota, an individual who meets three of the criteria is classified as a confirmed gang member. Information gathered on each individual gang member is "put into his file, or profile" and maintained in a statewide database.

Bautista testified about how gangs had their own terminology, stating that this terminology varied from gang to gang and the ethnic background of each gang. He talked about how gangs marked their territory, or "turf," with gang graffiti such as "B.L." for Batos Locos, "SUR 13" for the Sureños, and "L.K." for Latin Kings.

---

**2.** Bautista did not elaborate on the MGSF's ten criteria. For the ten criteria, *see State v. DeShay,* 669 N.W.2d 878, 882 n. 3 (Minn. 2003). The ten criteria as described in *DeShay* are as follows: (1) admits gang membership or association; (2) is observed to associate on a regular basis with known gang members; (3) has tattoos indicating gang membership; (4) wears gang symbols to identify with a specific gang; (5) is in a photograph with known gang members and/or using gang-related hand signs; (6) name is on a gang document, hit list, or gang-related graffiti; (7) is identified as a gang member by a reliable source; (8) arrested in the company of identified gang members or associates; (9) corresponds with known gang members or writes and/or receives correspondence about gang activities; and (10) writes about gangs, which would be graffiti on walls, books, and/or paper. *See also State v. Frazier,* 649 N.W.2d 828, 834–35 (Minn.2002).

With regard to the Minneapolis Latin Kings, Bautista testified that they were located in a pretty large area on the south side of Minneapolis. He said the Latin Kings were the most structured of the gangs, with an "Inca" or leader "all the way down to the soldier who operates off the street." He testified about the Latin Kings' identifying colors (primarily black and gold), signs or symbols (a crown, "L.K." or "Latin King" spelled out), and a "certain handshake."

Bautista explained the rituals for entering and leaving a gang. A member is "jumped in" by sustaining a beating for at least a minute and "jumped out" the same way. When asked whether the Latin Kings had any type of rules or constitution for their members, Bautista testified about their literature, or "lit," which was written by "Pedro Mil[l]an who is currently housed in [a] Connecticut state prison." He testified that all gang members learn and abide by this literature. He also said there was nothing in the literature that allowed for retirement from a gang for family reasons, rebutting evidence that Lopez–Rios had dropped out of the Latin Kings for such reasons.

Bautista also talked about the alliance between the Latin Kings and the Sureños, also called "Trece, which is 13" and which "stands for the Mexican mob." He explained that Hispanic gangs in California were divided between the north and south; and he said that when gangs left California, they adopted the name Sureño (Southerner) or Norteno (Northerner), with the exception of the 18th Street gang. Bautista went on to explain that the 18th Streeters kept their own name because the gang was very large, numbering around 9,000 in Los Angeles, "making them the largest Hispanic gang in the city of Los Angeles." Because of a "rift" with the 18th Street gang, in Minneapolis the Latin Kings and the Sureños were allies. Bautista also testified that, in gang culture, when a gang was attacked by a rival gang, retaliation was necessary to defend honor and turf.

Bautista testified that the Minneapolis Latin Kings had three or more members. He stated that one of the gang's primary activities was the commission of crimes of violence, and gang members had engaged in a pattern of criminal activity. Over an objection by Lopez–Rios, Bautista was permitted to state that Lopez–Rios, Martinez, and Vargas were members of the Latin Kings criminal street gang. Bautista indicated that Lopez–Rios fit the MGSF gang-identification criteria.

Lopez–Rios moved for a mistrial based on several objections made to the gang-expert testimony. The district court, noting that a number of objections already had been sustained, denied the motion, concluding that the testimony elicited in front of the jury did not create a basis for mistrial. After the state rested its case, Lopez–Rios waived his right to testify, relying on his Fifth Amendment privilege against self-incrimination and requiring the state to carry the burden of proof in its case-in-chief.

The jury found Lopez–Rios guilty as charged, and he was sentenced to life in prison for first-degree murder, plus an additional 12 months because the crime was for the benefit of a gang. The district court also imposed a consecutive 48–month sentence for the drive-by shooting involving the second victim, plus an additional 12 months to this sentence because the crime was for the benefit of a gang. This appeal followed.

## I.

Lopez–Rios challenges the admissibility of gang-expert testimony, asserting that it did not assist the jury in understanding the evidence and that even

if helpful, its probative value was substantially outweighed by the risk of undue prejudice. Admission of expert testimony rests within the broad discretion of the district court. *State v. Ritt,* 599 N.W.2d 802, 810 (Minn.1999). The primary consideration for admission of evidence under Minn. R. Evid. 702 is "whether the testimony will assist the jury in resolving factual questions presented." *State v. Grecinger,* 569 N.W.2d 189, 195 (Minn.1997).

■■■■ With regard to proffered gang-expert testimony, district courts have the responsibility of scrutinizing such testimony, "preferably outside the presence of the jury, 'and exclud[ing] it where irrelevant, confusing, or otherwise unhelpful.'" *State v. DeShay,* 669 N.W.2d 878, 888 (Minn. 2003) (quoting *State v. Miles,* 585 N.W.2d 368, 371 (Minn.1998)). Gang-expert testimony "must add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience." *Id.* at 888. Such testimony "must be carefully monitored by the court so that the testimony will not unduly influence the jury or dissuade it from exercising its independent judgment. Even if acceptable under Rule 702, expert testimony should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Minn. R. Evid. 403." *Id.* at 888.

In *DeShay,* we concluded that expert testimony relating to gang activity in general and gang affiliation was neither necessary nor helpful to the jury in evaluating the relevant evidence. We concluded that *DeShay* was a routine drug conspiracy case and that in the context of that case, much of the gang expert's testimony was duplicative and more prejudicial than probative. *Id.* at 888. Witnesses in *DeShay* with firsthand knowledge had already provided testimony relating to the elements of the offense and we concluded that the jury

needed no expert assistance in evaluating the evidence or deciding a fact issue. *Id.* at 889. Moreover, if the admission of such testimony is not carefully monitored, a defendant can end up being tried for the criminal actions and bad acts of others. *Id.* at 889.

■■■■ Here, as in *DeShay,* the gang expert's testimony was largely duplicative of that given by witnesses with firsthand knowledge who had already testified that Lopez–Rios was associated with the Latin Kings. These witnesses identified the Latin Kings as a group that included more than three people, had committed the drive-by shooting in retaliation for a prior shooting incident involving a rival gang, and had, as a group, collectively engaged in "cruising" to shoot enemies. While a brief history of the Sureño 18th Street rivalry and an explanation of the importance of retaliation in the gang culture may have been helpful, there was no need for Bautista to mention that Southern California has "an inordinate number" of Hispanic gangs, that the Los Angeles 18th Street gang has over 9,000 members, or that the author of the Latin Kings "lit" was currently in prison in Connecticut.

■■■■ Equally troublesome was the expert testimony on Lopez–Rios's membership in a gang. Minnesota Rule of Evidence 704 permits testimony in the form of an opinion about ultimate issues. Nevertheless, "there is something rather offensive in allowing an investigating officer to testify not simply that a certain pattern of conduct is often found" in specific criminal cases, "leaving it for the jury to determine whether the defendant's conduct fits the pattern, but also that such conduct [fit] the pattern[.]" *United States v. Brown,* 776 F.2d 397, 401 (2d Cir.1985). Expert testimony that a defendant is a member of a criminal gang comes close to, although not completely within, the exclusion of expert

opinion as to the mental state of a defendant constituting an element of the charged crime. *See State v. Chambers*, 507 N.W.2d 237, 239 (Minn.1993).

▆▆▆▆ While the evidentiary rules do not bar all expert testimony concerning the ultimate issue, a district court may exclude ultimate issue testimony under Rule 702 or Rule 403 when the testimony would merely tell the jury what result to reach. *See Brown*, 776 F.2d at 401 (citing Fed.R.Evid. 704 advisory committee's notes). Furthermore, expert testimony on the issue of a defendant's gang membership that rests on hearsay has Sixth Amendment Confrontation Clause implications. *See generally* 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 359(c) (2d ed.1994). While we tolerate the "battle of experts" in other areas of the law, we do not allow such battles to limit the rights of criminal defendants. *See State v. Myers*, 359 N.W.2d 604, 609–10 (Minn.1984) (stating that even though an expert's testimony may arguably provide the jury with potentially useful information, "[i]n most cases * * * the possibility that the jury may be unduly influenced by an expert's opinion mitigates against admission.").

▆▆▆ As we previously noted, the district court enjoys broad discretion in deciding to admit expert testimony under Rules 702 and 403. But here significant parts of the expert's testimony were beyond the margin of what we deem acceptable. We conclude that there was little, if any, real value to much of the gang expert testimony, especially when considered in light of its probative value versus potential prejudice; therefore, we hold that admission of this testimony was error. Nevertheless, we hold that the admission of the testimony was not sufficiently prejudicial to justify a new trial. " 'Reversal is warranted only when the error substantially influences the jury's decision.' " *DeShay*, 669 N.W.2d at 888 (quoting *State v. Nunn*, 561 N.W.2d 902, 907 (Minn.1997)). As in *DeShay*, we are satisfied that any error in the admission of the gang expert testimony was harmless where, given the testimony of the other witnesses, there was no reasonable possibility the gang expert's testimony substantially influenced the guilty verdict. Because we are satisfied that any error was harmless, it is not necessary for us to delineate in detail those parts of Bautista's testimony that were improper other than to generally point to that testimony which was duplicative, was related to general gang activity and affiliations, was extraneous to the factual issues before the jury, and was prejudicial.

## II.

▆▆▆ Lopez–Rios also asserts error in the omission of a limiting jury instruction to minimize the potential of the gang expert's testimony for prejudice. Harmless error analysis is applicable to an erroneous omission of cautionary instructions. *State v. Shoop*, 441 N.W.2d 475, 481 (Minn. 1989). The district court denied defense counsel's motion for a character-evidence instruction, concluding that gang affiliation was not evidence of character or a character trait.[3] Lopez–Rios argues that Bautista's testimony that he fit the MGSF gang-identification criteria was profile evidence, akin to character evidence. Assuming

---

3. Lopez–Rios requested as a jury instruction CRIMJIG 3.21 which provides that character evidence may be used "with all the other evidence in the case in determining whether or not the prosecution has proven the defendant's guilt beyond a reasonable doubt." 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.21 (4th ed.1999).

without deciding that the omission of the instruction was erroneous, our independent review of the record compels us to conclude that the omission did not have a significant impact on the verdict in this case, and therefore we hold any error would be harmless error.

### III.

 Lopez–Rios also argues that he was denied a fair trial because the state engaged in misconduct during closing arguments by misstating the evidence and vouching for witness credibility. At trial, during direct examination of one of the state's witnesses, there was testimony that while en route to the 18th Street gang's territory, Lopez–Rios said that he wanted to use the gun. On re-direct, defense counsel objected to the state's question that Lopez–Rios "wanted to do the job" as leading and the objection was sustained. In closing, the state told the jury that Lopez–Rios "said words to the effect 'I'm going to do the job.'" We conclude that the state's remarks merely paraphrased the substance of the witness's testimony and "at worst, [were] unartful, not misconduct." *State v. Atkins,* 543 N.W.2d 642, 648 (Minn.1996). As for vouching, that occurs "'when the government implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility.'" *State v. Patterson,* 577 N.W.2d 494, 497 (Minn.1998) (quoting *United States v. Beasley,* 102 F.3d 1440, 1449 (8th Cir.1996)). But the state may argue that particular witnesses were or were not credible. Here, we are satisfied no vouching occurred. Accordingly, we hold that the state did not engage in prosecutorial misconduct.

### IV.

██ Lopez–Rios has submitted a three-page supplemental pro se brief lacking citation to any legal authority. In his brief, Lopez–Rios first argues that defense counsel in his opening statement represented Lopez–Rios as being guilty without having his permission to do so. Lopez–Rios cites to two pages of the trial transcript without indicating precisely what he believed to be an admission of guilt. The pages of the transcript cited by Lopez–Rios reflect that counsel, after telling the jury there was insufficient evidence to convict Lopez–Rios of the charges against him, stated Lopez–Rios was guilty of a lesser-included offense that the jury had not heard about, which instruction he would later ask the judge to submit to the jury. Counsel continued by stating that just because someone died does not mean that a premeditated murder occurred, arguing that it could be an accident or "[m]aybe even less than that." At the conclusion of his opening statement, counsel stated, "In the end we believe that it's going to be a sad ending no matter what for Mr. Lopez–Rios, but we believe that you'll acquit him of first degree intentional murder, second degree intentional murder and all this stuff for the benefit of a gang * * *."

A review of the record reveals that defense counsel did not admit guilt on the charged offenses. The opening statement section cited by Lopez–Rios in his brief shows counsel arguing that, while perhaps Lopez–Rios was guilty of some lesser-uncharged offense, he was not guilty of the serious charges he faced at trial. Counsel's admission to an undisclosed, noncharged crime is not a concession of guilt so as to entitle Lopez–Rios to a new trial. Counsel's assertion that "it is going to be a sad ending no matter what for Mr. Lopez–Rios * * *," although of questionable logic as a matter of trial strategy, is also clearly not an admission of guilt. Throughout the trial, counsel argued that the evidence

against Lopez–Rios was weak, that there was no intent to commit murder, that Lopez–Rios was not a gang member, and that Lopez–Rios withdrew from the plan to carry out a drive-by shooting. The record simply does not support Lopez–Rios's argument that his counsel admitted his guilt. Therefore, we conclude that Lopez–Rios's ineffective assistance of counsel claim is meritless.

■ Next, Lopez–Rios argues that the district court erred by allowing Alfonso Martinez to testify without first being duly sworn. The record reflects that Martinez was called forward and testified, yet the record contains no indication that he was ever duly sworn. We have held that "failure to swear a witness in an ordinary civil trial, or even in a criminal trial, may be waived by failure to object or by express consent." *Martin v. Wolfson*, 218 Minn. 557, 568, 16 N.W.2d 884, 890 (1944). Here, there was no objection at trial to the apparent failure to swear Martinez. We conclude that, by failing to object at trial, where the court has the opportunity to remedy this oversight, Lopez–Rios waived the right to raise the issue on appeal. Having found the issue waived, we do not reach the merits of the claim.

■ Finally, Lopez–Rios argues that there was insufficient evidence to support a conviction of first-degree premeditated murder. In particular, Lopez–Rios points to a lack of proof of intent or premeditation. Intent and premeditation are subjective states of mind proved through a defendant's conduct in the given circumstance. *See State v. Ness*, 431 N.W.2d 125, 131 (Minn.1988). Both can be supported by inferences from actions before and after the crime occurred. *Id.* at 131. In reviewing the record, we view "the evidence in the light most favorable to the verdict and assume[] that the fact-finder disbelieved any testimony conflicting with the result reached." *State v. Thomas*, 590 N.W.2d 755, 757 (Minn.1999). The verdict will not be overturned if, giving due regard to the presumption of innocence and to the state's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense. *Id.* at 757–58.

The evidence of premeditation presented at trial included the following testimony. Vargas testified that Hernandez asked the group, including Lopez–Rios, if they wanted to go find some members of the 18ths and Lopez–Rios agreed; Vargas saw Lopez–Rios holding a gun five or six blocks from the place of the shooting; and Lopez–Rios said he planned to use the gun if the 18ths were on his side of the car. When the 18th Street gang members were spotted on the other side of the car, Lopez–Rios attempted to hand the gun to Vargas. Immediately after the shooting, when back on the freeway, Lopez–Rios clasped hands with the others in the car in a celebratory gesture. In addition to the testimony offered by Vargas, Alfonso Martinez testified to hearing Lopez–Rios inform his cousin, Ganbino, who had been a victim in the earlier drive-by shooting, "that he [Lopez–Rios] got him back." We hold that sufficient evidence was introduced at trial to support Lopez–Rios's conviction for first-degree premeditated murder.

## V.

■ Minnesota Statutes § 609.04 (2002) forbids two convictions of the same offense or one offense and a lesser-included offense on the basis of the same criminal act. In a crime committed for the benefit of a gang, the underlying crime is an included crime. *State v. Matelski*, 622 N.W.2d 826, 833 (Minn.App.2001). Although the state acknowledged in its sentencing memorandum that there should be

adjudications of guilty of only counts two—first-degree premeditated murder committed for the benefit of a gang—and eight—drive-by shooting committed for the benefit of a gang—the warrant of commitment reflects adjudications on the remaining counts as well. Accordingly, we vacate any formal adjudication of guilt for counts one, three, four, five, six, and seven. *See State v. LaTourelle*, 343 N.W.2d 277, 284 (Minn.1984). Affirmed as modified.

Affirmed as modified.

GILBERT, Justice (concurring specially).

I concur with the result reached by the majority but respectfully disagree with the majority's analysis relating to the admission of expert testimony on gangs and gang affiliation. For reasons similar to those mentioned in my special concurrence in *DeShay*, we should not exclude a gang's expert testimony primarily because the testimony was "largely duplicative of that given by witnesses with firsthand knowledge who had already testified." The majority again fails to utilize our clear abuse of discretion standard, which we have used in these circumstances in the past because the district court should be given broad discretion in deciding to admit expert testimony. *State v. Koskela*, 536 N.W.2d 625, 629 (Minn.1995). This decision creates a murky new standard when it announces: "here significant parts of the expert's testimony were beyond the margin of what we deem acceptable. Therefore, we conclude that there was little, if any, real value to much of the gang expert testimony, especially when considered in light of its probative value versus potential prejudice * * *." The majority's tepid decision departs from our clear abuse of discretion standard, but then nevertheless holds that "the admission of the testimony was not sufficiently prejudicial to justify a new trial."

The question now is whether expert testimony can ever be used even when the expert uses the criteria as part of an investigation workup? The majority's analysis would appear to exclude such testimony, even though there was no motion in limine, cross-examination or impeachment evidence offered by the defense, and gang-related activity is an element of the crime that the state has to prove beyond a reasonable doubt. It is unclear why in this case there was no "real value" to the gang-related testimony or why it was held to be "beyond the margin of what we deem acceptable."

I agree with the majority that if the admission of such testimony is not carefully monitored, a defendant can end up being tried for the criminal actions and bad acts of the others. However, it is the primary responsibility of defense counsel to do such monitoring and if the testimony is objectionable, to make proper and timely objections. Otherwise, the trial court must sua sponte interject itself into the trial tactics of presenting a case. Here, a motion in limine and hearing as to foundation would have provided a basis for the judge to respond to objections as to qualifications and the factual basis for the objection and at the same time provide a record on appeal. Now, because of an inadequate record, the majority is hampered in providing any guidance or to delineate in detail to counsel or the trial court as to what "significant parts of the expert testimony were beyond the margin * * *."